2008 ND 154

Cynthia KORTUM and Cynthia
Kortum Enterprises, Ltd.,
Plaintiffs and Appellants

v.

Steve JOHNSON, Therese Johnson, Tracy Martin, Michelle Radke–Hella, and Independent Family Doctors, LTD., Defendants and Appellees.

No. 20070186.

Supreme Court of North Dakota.

Aug. 28, 2008.

Craig E. Johnson, Johnson, Ramstad & Mottinger, PLLP, Fargo, ND, for plaintiffs and appellants.

Sara K. Sorenson, Ohnstad Twichell, P.C., West Fargo, ND, for defendants and appellees.

MARING, Justice.

[¶ 1] Cynthia Kortum and Cynthia Kortum Enterprises, Ltd. (collectively "Kortum") appeal a district court judgment entered in favor of Steve Johnson, Therese Johnson, Tracy Martin, Michelle Radke–Hella, and Independent Family Doctors, Ltd. (collectively "Shareholders") after a bench trial.

[¶ 2] Kortum and the individual Shareholders are all physicians. They were the founding, and the only, shareholders of Independent Family Doctors, Ltd. ("Corporation"). Kortum filed a complaint alleging the Shareholders wrongfully expelled her from the Corporation. She claimed the Shareholders acted in a manner unfairly prejudicial to Kortum by breaching the fiduciary duty they owed Kortum as a shareholder in a close corporation, thus entitling her to relief under N.D.C.C. ch. 10–19.1. The district court entered a judgment dismissing Kortum's complaint and awarding costs and disbursements to the Shareholders. The district court concluded Kortum was an at-will employee of the Corporation, and she bargained away any claim for breach of fiduciary duty by signing a shareholder buy-sell agreement ("Agreement") contemplating the involuntary termination of employee shareholders of the Corporation. Thus, the district court concluded she was entitled to no statutory relief for her termination. The district court further concluded that, under the Agreement, Kortum

had to sell her shares of stock in the Corporation to the Corporation for $1.

[¶ 3] Kortum appeals, arguing she is entitled to relief under N.D.C.C. ch. 10–19.1 and the district court misinterpreted the stock purchase price provisions of the Agreement. We hold that the Shareholders owed Kortum a duty of utmost loyalty and good faith. Kortum did not "bargain away" the duty she was owed by the Shareholders by signing the Agreement. The Agreement is, however, presumed to reflect Kortum's reasonable expectations. We reverse and remand for further fact-finding and for application of N.D.C.C. ch. 10–19.1 to Kortum's claims. We further hold that if, on remand after making the relevant findings of fact, the district court concludes Kortum is not entitled to relief under N.D.C.C. § 10–19.1–115, Kortum will be entitled only to the share price provided in the Agreement which we conclude is $0.04 per share.

## I

### Facts

[¶ 4] The record shows that Kortum and the other four physicians were all previously employed by MeritCare in Fargo. They were concerned that practicing medicine in a large corporation was not a good fit for their individual practices, so they decided to open an independent clinic in the spring of 2002. In April 2002, each of the five physicians made a non-refundable contribution of $25,000 toward executing this plan. On July 16, 2002, the physicians entered into the Agreement. Under the Agreement, each physician was issued 5,000 shares in the Corporation for a total of 25,000 shares issued.

[¶ 5] After entering into the Agreement, the record reveals that the physicians each provided an additional $50,000 to cover the clinic's operating expenses for the initial five months of operation. Once that money was exhausted, the physicians began proportionately dividing the operational costs among themselves. The physicians shared equally in the income from lab fees generated at the clinic. They served their own patients and collected income from their own practices. Each physician's monthly pay consisted of the revenue generated by the physician's own practice, less one-fifth of the clinic's operational costs, plus one-fifth of the lab income.

[¶ 6] None of the physicians had employment contracts with the Corporation. However, the Agreement addresses termination of a shareholder's employment. Paragraph 3 of the Agreement provides:

3. *Termination of Employment.* If any Shareholder shall voluntarily or involuntarily terminate his employment with the Corporation, for any reason whatsoever, he shall sell his shares under the terms and conditions as set forth in paragraph 1 hereof.

A. *Employment defined.* The term "employment" as used in this paragraph shall include full or part-time employment with the Corporation or employment by the Corporation on a consulting basis or as a consultant.

B. *Waiver.* A majority of the outstanding shares of the Corporation, excluding the shares owned by the Shareholder whose employment is terminated, may waive or modify the requirements of this paragraph.

Paragraph 1 of the Agreement outlines the procedures to be followed in the event of a sale of shares and indicates that the purchase price for the shares of the Corporation "shall be as set forth in paragraph 6

or 7 hereof whichever is applicable." Paragraph 6 addresses share prices:

6. *Purchase price.* The price of each share to be sold under this Agreement is hereby stipulated to be $.04 per share ($1.00 for $25,000), subject, however, to the adjustments herein provided.

A. *Review of price.* At each annual meeting of the Shareholders of the Corporation or more frequently, at the option of the Shareholders, the price of a share of stock, including the worth of the company as a going concern, shall be fixed by the decision of a majority of the outstanding shares of the Corporation represented at the annual meeting, and shall be endorsed as Schedule "A" attached to the counterpart of this Agreement delivered to and held by the Corporation, on which each share value so fixed shall be verified by the signatures of the president or a vice president and of the secretary of the Corporation. . . .

B. *Default provision.* If at the annual meeting of the shareholders of the corporation, the shareholders are unable to agree upon a price as set forth in subparagraph A above, the price of each share to be sold under this Agreement shall be its book value. The term book shall mean the value of a share of the corporation as shown on the balance sheet of the corporation at the end of the month proceeding the date of offer, the date of death, or the date of termination of employment, which ever is applicable.

Schedule A of the Agreement, also dated July 16, 2002, states that "the Sharehold-ers have set the price of each share to be sold under this Agreement, subject to the adjustments provided in this Agreement as follows: . . . One share of common stock is valued at $.04, upon the retirement, disability, or other lifetime transfer of a share of stock."

[¶ 7] The record indicates that, in March 2005, Kortum confronted another shareholder regarding sexual harassment of a female lab technician employed at the clinic. Following a June 2005 meeting of the Shareholders, one of the Shareholders confronted Kortum with several alleged patient complaints. In August 2005, the female lab technician who complained of sexual harassment was fired after taking extra vacation days without obtaining permission from her supervisor. Kortum asserted the lab technician was treated unfairly and asked the Corporation to rehire her. Kortum testified that she supported the lab technician at an unemployment compensation hearing. Other shareholders disagreed and opposed an award of unemployment benefits to the lab technician.

[¶ 8] Kortum's employment with the Corporation was terminated in December 2005 by the Shareholders. On December 7, 2005, Kortum was instructed to be out of the clinic by the end of the month. The Shareholders offered her $1.00 in return for her stock. She refused their offer and brought a claim against the Shareholders on December 22, 2005.

[¶ 9] Kortum sought an injunction and monetary damages. The district court denied her request for equitable relief concluding she could avail herself of legal damages. She sought damages in the amount of the fair value of her stock, her lost income, and other benefits. The Shareholders denied any wrongdoing and sought a judgment determining that the Agreement required Kortum to sell her

shares of stock to the Corporation and to assign her stock interest accordingly.

[¶ 10] A bench trial was held. The parties presented conflicting evidence regarding Kortum's conduct as a shareholder and clinic physician. Kortum alleged that she had not been made adequately aware of the other shareholders' dissatisfaction with her performance. She testified that she expected to work with the Corporation until her retirement. She asserted that she expected to set her own schedule, have her own nurse, and participate in office management. Kortum also said she practiced the same at the clinic as she had prior to joining the clinic and the other physicians knew how she operated. She also contended her support of the fired lab technician motivated the other shareholders' vote to terminate her.

[¶ 11] The Shareholders testified that Kortum used foul language within earshot of patients, name-called, stored Botox in refrigerators designated to hold only vaccinations, misdiagnosed several patients, frequently took days off without notice, failed to fulfill her duties while on call, failed to regularly attend meetings, and did not present a "united front" to clinic employees when she disagreed with a majority of the physician shareholders regarding a clinic decision. The Shareholders further testified that all the physician shareholders understood from the beginning that they would receive only a nominal amount in return for their shares if they left the clinic. The Shareholders also testified that Kortum had not suffered a loss of capital because the money the physicians paid up-front was used for operating expenses, and the Corporation does not own assets of any significant value because it leases most of its equipment and the premises where the clinic is located.

[¶ 12] The district court found that Kortum was an at-will employee of the corporation. It concluded that the Agreement anticipated physician shareholder termination, and Kortum bargained away any rights she had to a breach of fiduciary duty claim by signing the Agreement. The district court also concluded that the Agreement provided Kortum's remedy and she must sell her shares under the terms and conditions of the Agreement. Because the physician shareholders had not addressed the issue of share valuation at their annual meetings, the district court held that the original value of $1.00 provided in the Agreement was the applicable stock price. The district court entered a judgment dismissing Kortum's complaint and awarding costs and disbursements to the Shareholders. The district court judgment also ordered Kortum to surrender and sell all of her 5,000 shares of stock in the Corporation to the Corporation for $1.00.

[¶ 13] Kortum appeals the district court judgment, arguing (1) she is entitled to relief under N.D.C.C. ch. 10–19.1, the Business Corporation Act, and (2) the district court misinterpreted the stock purchase price provisions of the Agreement.

## II

### Business Corporations Act

[¶ 14] We first address Kortum's argument that she is entitled to relief under N.D.C.C. ch. 10–19.1, the North Dakota Business Corporations Act. "Chapter 10–19.1, N.D.C.C., imposes a duty upon officers, directors, and those in control of a corporation to act in good faith, and affords remedies to minority shareholders if those in control act fraudulently, illegally, or in a manner unfairly prejudicial toward any shareholder." *Lonesome Dove Petroleum, Inc. v. Nelson*, 2000 ND 104, ¶ 30, 611 N.W.2d 154 (citing N.D.C.C. §§ 10–19.1–50(1), 10–19.1–60, and 10–19.1–

115(1)(b)).[1] Questions of statutory interpretation are questions of law fully reviewable on appeal. *Rodenbiker v. Workforce Safety and Ins.*, 2007 ND 169, ¶ 15, 740 N.W.2d 831.

### A. Statutory Framework

[¶ 15] In an action by a shareholder under N.D.C.C. § 10–19.1–115(1)(b) for judicial intervention, the shareholder must first establish one or more of the circumstances described in subdivision (b) of subsection (1). *See* N.D.C.C. § 10–19.1–115(3). Under N.D.C.C. § 10–19.1–115(1)(b)(3), when it is established that the "directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders or directors of a corporation that is not a publicly held corporation or as officers or employees of a closely held corporation," a "court may grant any equitable relief it deems just and reasonable in the circumstances or may dissolve a corporation and liquidate its assets and business" in a shareholder action.

[¶ 16] When a court determines whether to order equitable relief or dissolution under N.D.C.C. § 10–19.1–115 to a shareholder of a closely held corporation, "the court shall take into consideration the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner in the operation of the corporation and the rea-sonable expectations of the shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other." N.D.C.C. § 10–19.1–115(4). Thus, in deciding the relief to order, the court must consider (1) the duty owed by all shareholders to one another *and* (2) the reasonable expectations of "the shareholders" at the corporation's inception and as they develop. For purposes of that determination, "any written agreement, including an employment agreement and a buy-sell agreement, between or among shareholders or between or among one or more shareholders and the corporation is presumed to reflect the parties' reasonable expectation concerning the matters dealt with in the agreement." *Id.* Under N.D.R.Evid. 301, "if facts giving rise to a presumption are established by credible evidence, the presumption substitutes for evidence" until the presumption is rebutted.

[¶ 17] When a non-publicly held corporation is at issue in an action under N.D.C.C. § 10–19.1–115(1), the court may order the sale of all of a party's shares in the corporation if the court determines that such order would be fair and equitable. N.D.C.C. § 10–19.1–115(3). If the court determines a sale is appropriate, the purchase price must be the fair value of the shares. N.D.C.C. § 10–19.1–115(3)(a). "However, if the shares in question are then subject to sale and purchase pursuant to the bylaws of the corporation, a share-

---

1. The dissent accuses the majority of overlooking the statement in *Lonesome Dove Petroleum, Inc.*, 2000 ND 104, ¶ 29, 611 N.W.2d 154, that "because the legislature has provided extensive standards and remedies for violation of minority shareholders' rights, there is no separate common law duty...." The dissent, however, omitted the footnote which states:

    Although there is no longer a separate common law fiduciary duty, N.D.C.C. ch. 10–19.1 codifies many of the duties previously imposed under the common law. Therefore, the common law as expressed in previous decisions of this Court may provide guidance in defining the parameters of the fiduciary duties owed by directors, officers, and minority shareholders under N.D.C.C. ch. 10–19.1.

*Id.* at ¶ 29, n. 1. Therefore, the common law is not abrogated for purposes of determining the scope of the fiduciary duty.

holder control agreement, the terms of the shares, or otherwise, the court shall order the sale for the price and on the terms as set forth, unless the court determines that the price or terms are unreasonable under all the circumstances of the case." *Id.*

### B. The Parties' Arguments

[¶ 18] Kortum argues she is entitled to relief under N.D.C.C. ch. 10–19.1 because the Shareholders breached fiduciary duties owed to her. She maintains that she had an expectation that she would practice at the Corporation until her retirement and that she would share in the costs, lab profits, and management of the Corporation. She asserts the district court erred in determining that she bargained away a claim for breach of fiduciary duty by signing the Agreement. She contends it is unfair that she lose her entire investment, her continued earnings on that investment, her place of employment, her patient base, and her accounts receivable in exchange for a nominal amount of money. Kortum argues she is entitled to the pro-rata share of the value of the Corporation as a going concern. She requests that this case be remanded for entry of judgment in her favor to compensate her for her share of the equity in the Corporation as of the month preceding her termination, for lost income from the time of her termination until she gained other employment, for lost income from lab fees, costs, and interest.

[¶ 19] The Shareholders argue that the district court correctly determined that Kortum has no claim for breach of fiduciary duty resulting from her involuntary termination because she acknowledged in the Agreement that she could be terminated "voluntarily or involuntarily" and "for any reason whatsoever." The Shareholders assert that a minority shareholder in a close corporation who contractually agrees to the repurchase of her shares upon termination of her employment acquires no right from the corporation or majority shareholders against at-will discharge by virtue of her minority shareholder status. The Shareholders maintain that the Agreement evidences Kortum's reasonable expectations. The Agreement contemplated the possibility of involuntary termination of a shareholder. Accordingly, the Shareholders assert Kortum has no right to any form of equitable relief.

### C. Close Corporation Shareholder-Employees and the At–Will Doctrine

[¶ 20] When the district court denied Kortum's request for relief, it did not determine whether she was unfairly prejudiced under N.D.C.C. § 10–19.1–115(1)(b)(3). Instead, the district court characterized Kortum's termination as the termination of an at-will employment relationship and concluded she "bargained [away] any rights she had to a breach of fiduciary duty claim by signing the [Agreement]." "Under N.D.C.C. § 34–03–01, employment without a definite term is presumed to be at will, and an at-will employee may be terminated with or without cause." *Dahlberg v. Lutheran Social Services of North Dakota*, 2001 ND 73, ¶ 13, 625 N.W.2d 241; *see also Jose v. Norwest Bank North Dakota, N.A.*, 1999 ND 175, ¶ 10, 599 N.W.2d 293. The record supports the district court's determination that Kortum was an at-will employee because there was no definite term prescribed for Kortum's employment by the Corporation.

[¶ 21] Even though Kortum was an at-will employee, and therefore could be terminated with or without cause, the termination of her employment triggers an inquiry into whether the Corporation acted in a manner unfairly prejudicial toward Kortum in her capacity as a shareholder-

employee. *See Gunderson v. Alliance of Computer Professionals, Inc.,* 628 N.W.2d 173, 190 (Minn.Ct.App.2001) (stating that "[t]he doctrine of employment-based shareholder oppression is distinct from the wrongful-termination doctrine, and the analysis under the separate doctrines should attempt to protect close-corporation employment and, at the same time, respect the legitimate sphere of the at-will rule"); 1 Robert B. Thompson, *O'Neal and Thompson's Close Corporations and LLCs* § 6:2 (Rev. 3d. 2007) (stating, "[i]ncreasingly, courts have come to recognize that within many closely held enterprises it is not as easy to separate out the employment relationship from the ownership relationship, and have applied the reasonable expectations approach used more generally in close corporations"). Kortum's claims regarding the Shareholders' alleged breach of fiduciary duties are, therefore, properly analyzed within the framework of N.D.C.C. ch. 10–19.1. *See Brandt v. Somerville,* 2005 ND 35, ¶ 7, 692 N.W.2d 144 (applying N.D.C.C. ch. 10–19.1 to claims that controlling shareholder in a closely held corporation breached fiduciary duties owed non-controlling shareholder).

**D. Unfairly Prejudicial Action Inquiry**

[¶ 22] Thus, we now consider whether Kortum was entitled to relief under N.D.C.C. ch. 10–19.1 because of unfairly prejudicial action toward Kortum as a shareholder-employee of the Corporation. We have not interpreted the phrase "in a manner unfairly prejudicial toward . . . shareholders" used in N.D.C.C. § 10–19.1–115(1)(b)(3). However, the Minnesota Court of Appeals has interpreted the same phrase "to mean conduct that frustrates the reasonable expectations of all shareholders in their capacity as shareholders or directors of a corporation that is not publicly held or as officers or employees of a closely held corporation." *See Gunder-*

*son,* 628 N.W.2d at 184. Minnesota's interpretation of their Business Corporations Act, Minn.Stat. 302A, is relevant to our consideration of this case because "numerous sections of [N.D.C.C. ch. 10–19.1] were derived from the Minnesota Business Corporations Act, Chapter 302A, Minn. Stat.Ann." *KBM, Inc. v. MacKichan,* 386 N.W.2d 914, 916 n. 1 (N.D.1986); *see also Jones v. Billings Co. School Dist. # 1,* 1997 ND 173, ¶ 10, 568 N.W.2d 477 (stating our corporations statutory provisions were adopted from Minnesota); Minn.Stat. § 302A.751 (mirrored by language used in N.D.C.C. § 10–19.1–115). "When our statute is derived from and substantially identical to a statute from another state, the judicial decisions interpreting the foreign statute are highly persuasive." *Treiber v. Citizens State Bank,* 1999 ND 130, ¶ 14, 598 N.W.2d 96. A statute "adopted from another state without change . . . is taken with the construction placed upon it by the courts of that state, and it is presumed the legislature intended that construction." *Id.* Section 10–19.1–115, N.D.C.C., is virtually identical in wording to Minn.Stat. § 302A.751.

[¶ 23] Under N.D.C.C. § 10–19.1–115(1)(b)(3), our analysis of whether Kortum was unfairly prejudiced must include consideration of the duty the Corporation shareholders owed one another and the reasonable expectations of the Corporation shareholders.

**1. Duty Owed Kortum as a Shareholder**

[¶ 24] We first consider what duty the Shareholders owed Kortum in her capacity as a shareholder. The fiduciary duty of a shareholder is a question of law that we review de novo. *See Advanced Communication Design, Inc. v. Follett,* 615 N.W.2d 285, 289 (Minn.2000). Whether shareholder action constitutes a breach

of fiduciary duty under N.D.C.C. ch. 10–19.1 is a question of fact subject to the clearly erroneous standard of review under N.D.R.Civ.P. 52(a). *See Brandt*, 2005 ND 35, ¶ 12, 692 N.W.2d 144; *Lonesome Dove Petroleum, Inc.*, 2000 ND 104, ¶ 34, 611 N.W.2d 154.

■ [¶ 25] The district court determined that the Corporation is a "closely held corporation" under N.D.C.C. § 10–19.1–01(11) because it has fewer than thirty-five shareholders. Throughout this opinion, we use both the term "closely held corporation" and the term "close corporation" in reference to the Corporation and in discussing the law applicable to this case. The terms "closely held corporation" and "close corporation" are considered synonymous and are often used interchangeably. 1 Robert B. Thompson, *O'Neal and Thompson's Close Corporations and LLCs* § 1:4 (Rev. 3d. 2007). "The typical attributes of a close corporation are that: (1) the shareholders are few in number, often only two or three; (2) the shareholders usually live in the same geographical area, know each other, and are well acquainted with each other's business skills; (3) all or most of the shareholders are active in the business, usually serving as directors or officers or as key participants in some managerial capacity; and (4) there is no established market for the corporate stock." *Balvik v. Sylvester*, 411 N.W.2d 383, 386 (N.D.1987) (citing 1 F. O'Neal and R. Thompson, *O'Neal's Close Corporations* § 1.07 (3d ed. 1987)). *See*

*also Sorlie v. Ness*, 323 N.W.2d 841, 845 n. 2 (N.D.1982) (quoting *Brooks v. Willcuts*, 78 F.2d 270, 273 (8th Cir.1935)) (defining "close corporation" as " 'a corporation in which the stock is held in few hands, or in few families, and wherein it is not at all, or only rarely, dealt in by buying or selling' ").

[¶ 26] There is not a particular statutory section delineating the fiduciary duties closely held corporation shareholders owe one another. *Cf.* N.D.C.C. §§ 10–19.1–50 and 10–19.1–60 (prescribing standards of conduct for directors and officers of business corporations and requiring both corporate directors and officers to discharge their duties in good faith, in a manner the officers believe to be in the corporation's best interests, and with the care of an ordinarily prudent person in a like position under similar circumstances). However, N.D.C.C. § 10–19.1–115(4) indicates that "all shareholders in a closely held corporation owe one another" a duty "to act in an honest, fair, and reasonable manner in the operation of the corporation."

■ [¶ 27] Shareholders of close corporations owe one another a duty of utmost loyalty and good faith. *Schumacher v. Schumacher*, 469 N.W.2d 793, 797 (N.D.1991). Most of our cases concerning shareholders of closely held corporations discuss shareholder fiduciary duties in terms of duties owed by majority shareholders to minority shareholders. *See, e.g.*, *Balvik*, 411 N.W.2d at 387;[2] *Schu-*

---

**2.** The dissent criticizes citation to this Court's decisions in *Balvik* and *Schumacher* because *Balvik* was decided under "prior law." North Dakota's Business Corporations Act was enacted in 1985, 1985 N.D. Sess. Laws ch. 147 § 3, and *Balvik* was decided in 1987 by this Court. The underlying action was commenced in October 1985. In *Balvik*, our Court concluded that although dissolution was the only statutory remedy under N.D.C.C.

§ 10–21–16, equitable remedies not specifically stated in the statute were permitted. *Balvik*, 411 N.W.2d at 388. Our Court specifically noted that the North Dakota Business Corporations Act had been revised and that, under the provisions of N.D.C.C. § 10–19.1–115, a court may grant any equitable relief it deemed fair and reasonable. *Balvik*, 411 N.W.2d at 388, n. 3. We also noted that the terms "unfairly prejudicial" had been substi-

*macher*, 469 N.W.2d at 797; *Brandt*, 2005 ND 35, ¶ 7, 692 N.W.2d 144. A "majority shareholder" is a "shareholder who owns or controls more than half the corporation's stock," while a "minority shareholder" is a "shareholder who owns less than half the total shares outstanding and thus cannot control the corporation's management or singlehandedly elect directors." *Black's Law Dictionary* 1408 (8th ed. 2004). To be more exacting, we now clarify that the existence of the fiduciary duty owed by shareholders to other shareholders in a close corporation is not conditioned on the majority or minority status of the shareholders. *See, e.g., Hollis v. Hill*, 232 F.3d 460, 466–67 n. 16 (5th Cir. 2000) (quoting *Bonavita v. Corbo*, 300 N.J.Super. 179, 692 A.2d 119, 123 (1996)) (stating, "We note that both parties argue over the relevance of Hollis' status as an 'equal' rather than 'minority' shareholder. We find this distinction immaterial to the present dispute . . . . other jurisdictions have agreed that the question of minority versus majority should not focus on mechanical mathematical calculations, but instead, 'The question is whether they have the power to work their will on others— and whether they have done so improperly.' ").

▆▆▆▆ [¶ 28] This duty arises because of the nature and characteristics of close corporations and the potential for "freeze outs" of non-controlling close corporation shareholders. *Schumacher*, 469 N.W.2d at 797; *Balvik*, 411 N.W.2d at 386–87. The fiduciary duty in a close corporation context "appropriately is viewed as a protection of the shareholder's invest-

ment." *Hollis*, 232 F.3d at 471. This duty "embraces both substantive obligations that focus on the outcomes of shareholder conduct and procedural obligations that focus on process." *Gunderson*, 628 N.W.2d at 185. Substantive obligations include the obligation to not withhold dividends or use *corporate assets preferentially. Id.* Procedural obligations include the obligation to not engage in oppressive or unfair negotiating tactics. *Id.* The fiduciary duty owed by close corporation shareholders to one another also includes a duty of loyalty, "which encompasses an obligation to act with complete candor in their negotiations with each other." *Id.* at 186.

2. Reasonable Expectations

▆▆▆ [¶ 29] Section 10–19.1–115(4), N.D.C.C., also requires consideration of Kortum's reasonable expectations as a shareholder-employee in a determination of whether she is entitled to relief under N.D.C.C. ch. 10–19.1. This section demonstrates the importance that the legislature has placed on the "reasonable expectations" of shareholders in a close corporation. Whether a shareholder's reasonable expectations have been frustrated is essentially a fact issue. *Gunderson*, 628 N.W.2d at 186. "The threshold issue in a claim of shareholder oppression based on termination of employment is whether the minority shareholder had a reasonable expectation of continued employment." *Haley v. Forcelle*, 669 N.W.2d 48, 59 (Minn.Ct. App.2003).

▆▆▆ [¶ 30] Shareholders of closely held corporations typically have an expec-

---

tuted for the term "oppression" in the involuntary dissolution statute. *Id.* Further, we noted that Section 10–19.1–115, N.D.C.C., codified the "fiduciary duty" and "reasonable expectation" concepts as matters to be taken into consideration by the court. *Id.* Our Court concluded in *Balvik*, 411 N.W.2d at

388, that a trial court considering a case involving allegations of oppressive conduct must measure the conduct in light of the "fiduciary duty" and "reasonable expectations" concepts. Therefore, the very law applied in *Balvik* by our Court, was codified in N.D.C.C. ch. 10–19.1.

tation of continued employment. *Id.* As we have explained,

> Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and does not desire to assume the responsibilities of management, the shareholder in a close corporation considers himself or herself as a co[-]owner of the business and wants the privileges and powers that go with ownership. Employment by the corporation is often the shareholder's principal or sole source of income. As a matter of fact, providing for employment may have been the principal reason why the shareholder participated in organizing the corporation. Even if shareholders in a close corporation anticipate an ultimate profit from the sale of shares, they usually expect (or perhaps should expect) to receive any immediate return in the form of salaries as officers or employees of the corporation rather than in the form of dividends on their stock. Earnings of a close corporation, often are distributed in major part in salaries, bonuses and retirement benefits, a fact which illustrates how some business policies in a close corporation are more likely than in a publicly held corporation to be determined by tax consequences.

*Balvik,* 411 N.W.2d at 386 (quoting 1 F. O'Neal and R. Thompson, *O'Neal's Close Corporations* § 1.07 (3d. ed. 1987)). However, a "shareholder's expectation of continued employment is only reasonable if that expectation is known and accepted by other shareholders and properly balanced against the majority or controlling shareholders' need for flexibility in running the business." *Haley,* 669 N.W.2d at 59–60.

[¶ 31] Distinguishable from a close corporation shareholder who considers himself a co-owner of the business and is owed a fiduciary duty by other shareholders in the close corporation is a close corporation employee who owns shares only by virtue of his employment compensation package. *See Berreman v. West Pub. Co.,* 615 N.W.2d 362, 375 (Minn.Ct. App.2000) (stating that, while a typical close corporation shareholder may have an expectation of employment, an at-will employee "allowed to buy stock subject to a buy-back-on-termination agreement may have lower expectations"); *Hollis,* 232 F.3d at 471 (stating that it is "important to distinguish investors who obtain their return on investment through benefits provided to them as employees from employees who happen also to be investors" because "the precise nature of an investment in a close corporation often is not clear, particularly when the shareholder is also an employee"). For example, in *Harris v. Mardan Business Systems, Inc.,* 421 N.W.2d 350, 353 (Minn.Ct.App.1988), the court determined that an employee who did not invest money in the corporation at issue and acquired only a small percentage of stock as part of his compensation package did not have a reasonable expectation of continued employment. Therefore, the employee's relationship with the shareholder who capitalized and formed the corporation was not controlled by fiduciary principles. *Id.*

[¶ 32] Absent "a specific agreement, a shareholder's reasonable expectations are determined by examining the understanding that objectively reasonable close-corporation shareholders would have reached if they had bargained over how their investment should be protected when the venture began." *Haley,* 669 N.W.2d at 59. Under N.D.C.C. § 10–19.1–115(4), when the shareholders of a close corporation have entered a specific agreement concerning particular matters, that agreement is presumed to reflect the parties' reasonable expectations concerning

the matters dealt with in the agreement. Shareholder agreements are not, however, dispositive of shareholder expectations in all circumstances. *Gunderson,* 628 N.W.2d at 186. Moreover, entering into an agreement does not relieve close corporation shareholders of the high fiduciary duty owed one another in all mutual dealings. *See Blank v. Chelmsford OB/GYN, P.C.,* 420 Mass. 404, 649 N.E.2d 1102, 1106 (1995).

■ [¶ 33] North Dakota law expressly provides that a written agreement among shareholders concerning the shares to be issued by the corporation, control of the business of the corporation, the employment of shareholders, and other matters, is valid and specifically enforceable if signed by all persons who are shareholders of the corporation on the date the agreement is first effective. N.D.C.C. § 10–19.1–83(2). In the absence of evidence that controlling shareholders have manipulated an agreement to force the sale of a shareholder's shares, a close corporation shareholder's claim that the shareholder's reasonable expectations were frustrated by the enforcement of a shareholder agreement will fail if the shareholder agreement was made at arm's length, the shareholders had a legitimate business reason for agreeing to the provision at issue, and the shareholders all assumed the same risk. *See Gunderson,* 628 N.W.2d at 187. Disparity between an agreed-on share price and current market value alone is not sufficient to invalidate a transfer restriction.

*See Miller Waste Mills, Inc. v. Mackay,* 520 N.W.2d 490, 495 (Minn.Ct.App.1994).

[¶ 34] In a case concerning only the construction of a stock transfer agreement, and not whether enforcement of such agreement constituted action unfairly prejudicial to a shareholder, "[w]e said courts may not rewrite a shareholders' agreement under the guise of relieving one of the parties from the apparent hardship of an improvident agreement, and we recognized the general proposition that, in close corporations, a majority of courts have sustained restrictions that are determined to be reasonable in light of the relevant circumstances." *Brandt,* 2005 ND 35, ¶ 18, 692 N.W.2d 144 (citing *Sorlie,* 323 N.W.2d at 844–45).

3. Application to Kortum's Claims

■ [¶ 35] We agree with Kortum that she was owed a fiduciary duty by the Shareholders as a shareholder and a shareholder-employee.

[¶ 36] The district court concluded that "Kortum bargained any rights she had to a breach of fiduciary duty claim by signing" the Agreement. The district court relied on *Coleman v. Taub,* 638 F.2d 628 (3d Cir.1981), and *Jenkins v. Haworth, Inc.,* 572 F.Supp. 591 (W.D.Mich.1983), in reaching this conclusion. The district court's reliance on these cases, and the Shareholders' reliance on these cases on appeal, is misplaced.[3] Unlike Kortum, the shareholder claimant in *Coleman* was an employee of a close corporation who acquired a one percent ownership interest in the

---

**3.** The dissent finds it "curious" that we cite to *Berreman v. West Pub. Co.,* 615 N.W.2d 362, 375 (Minn.Ct.App.2000), because it cites *Coleman v. Taub,* 638 F.2d 628 (3d Cir.1981) favorably. The proposition for which we cite *Berreman* is that there is a distinction to be made between the shareholder who was an original investor and is also an employee and the shareholder who acquired his shares as part of a compensation package as an employee. These shareholders will have different "reasonable expectations." The Court of Appeals in *Berreman* cited *Coleman* for the proposition that a "shareholder who signed [a] buy-back agreement bargained for [the] right to be [a] shareholder only while employed" may have lower expectations. *Berreman,* 615 N.W.2d at 375.

corporation as part of his compensation package. *Id.* at 629. Likewise, the shareholder claimant in *Jenkins* was an employee of a close corporation who was given an ownership interest in the corporation as part of his compensation package. *Id.* at 595–96. Here, Kortum helped form and capitalize the Corporation. Her initial investment and her ownership share in the Corporation were the same as the investment and ownership share of each of the other physician shareholders.

[¶ 37] The Agreement did not relieve the Shareholders of their fiduciary duty. As previously stated, a district court's findings with regard to claims for breaches of fiduciary duties under N.D.C.C. ch. 10–19.1 are governed by the clearly erroneous rule of N.D.R.Civ.P. 52(a). *See Brandt v. Somerville,* 2005 ND 35, ¶ 12, 692 N.W.2d 144. The district court in the present case never made a finding whether the Shareholders' conduct was "unfairly prejudicial" toward Kortum. *See* N.D.C.C. § 10–19.1–115(1)(b)(3).

[¶ 38] Kortum maintains that she had an expectation that she would practice at the Corporation until her retirement. The threshold question in this context is whether a minority shareholder's expectation of employment is reasonable. *Gunderson,* 628 N.W.2d at 190. "Not all expectations of continuing employment are reasonable." *Id.* An expectation of continuing employment is reasonable only if it is "known and accepted by the other shareholders." *Id.* at 191. For purposes of this analysis, a reasonable expectation is one of which *all investors* shared a basic understanding at the inception of the venture and that, objectively viewed, was reasonable under the circumstances. *Id.* A shareholder's expectation of continuing employment must be balanced against the other shareholders' "need for flexibility to run the business in a productive man-

ner." *Id.* Controlling shareholders do not breach their fiduciary duty if they demonstrate a legitimate business purpose for their action. *See id.* (citing *Wilkes v. Springside Nursing Home, Inc.,* 370 Mass. 842, 353 N.E.2d 657, 663 (1976)).

[¶ 39] A shareholder who signs a buy-sell agreement binding him to sell his shares upon termination of employment would not likely have a reasonable expectation of continuing employment. *Id.* However, an expectation of continuing employment is reasonable if " 'continu[ing] employment can fairly be characterized as part of the shareholder's investment.' " *Id.* at 191 (quoting Douglas K. Moll, *Shareholder Oppression v. Employment at Will in the Close Corporation: The Investment Model Solution,* 1999 U. Ill. L.Rev. 517, 551–52 (1999)). "Factors to be considered in determining whether shareholders reasonably expected that their investment would entitle them to continuing employment include, among others, whether a shareholder's salary and benefits constitute de facto dividends and whether procuring employment with the corporation was a significant reason for investing in the business." *Id.*

[¶ 40] Here, the Agreement does contemplate the possibility of involuntary termination of a shareholder's employment. The Agreement is presumed to reflect the parties' reasonable expectations. *See* N.D.C.C. § 10–19.1–115(4). The Agreement should be honored to the extent it specifically states the terms of the bargain of Kortum and the Shareholders.

[¶ 41] We cannot conclude, as a matter of law, whether Kortum was entitled to relief under N.D.C.C. § 10–19.1–115. The district court did not make findings necessary to the determination of whether the Shareholders acted in a manner unfairly prejudicial to Kortum. The district court made no finding regarding

whether the Shareholders breached the fiduciary duty owed Kortum. The district court did not make any findings regarding whether the Agreement reflects the parties' reasonable expectations at the venture's inception. It did not make any findings regarding whether Kortum had a reasonable expectation of continued employment and return on her investment, and, if so, whether that expectation was frustrated by the Shareholders or whether they demonstrated a legitimate business purpose for their action. The district court's decision was induced by an erroneous view of the law which led to an absence of findings on Kortum's claims under N.D.C.C. ch. 10–19.1.

[¶ 42] We, therefore, reverse and remand for further fact-finding and application of N.D.C.C. ch. 10–19.1 to Kortum's claims. If the district court finds the Shareholders acted in a manner unfairly prejudicial to Kortum, and that Kortum is entitled to relief under N.D.C.C. § 10–19.1–115(1)(b)(3), it is within the district court's discretion to fashion an appropriate remedy. *See Brandt*, 2005 ND 35, ¶ 23, 692 N.W.2d 144 (stating that "a trial court has discretion to fashion remedies for violations of N.D.C.C. ch. 10–19.1, and we review a trial court's determination about remedies under the abuse-of-discretion standard"). In *Brandt*, 2005 ND 35, ¶¶ 23–25, 692 N.W.2d 144, the district court concluded, based on its findings, that it was appropriate to apply the stock transfer agreement formula when awarding damages and we affirmed.

## III

### Interpreting the Shareholder Agreement Share Price Provision

[¶ 43] Kortum argues the district court erred in its interpretation of the Agreement's price provision. Questions concerning the construction of a contract to determine its legal effect are questions of law. *Kondrad v. Bismarck Park District*, 2003 ND 4, ¶ 6, 655 N.W.2d 411. "[T]his Court will independently examine and construe the contract to determine if the trial court erred in its interpretation of it." *Id.* Whether a contract is ambiguous is also a question of law. *Id.* "A contract is ambiguous when rational arguments can be made for different interpretations." *Spagnolia v. Monasky*, 2003 ND 65, ¶ 10, 660 N.W.2d 223. If the terms of a contract are ambiguous, extrinsic evidence regarding the parties' intent may be considered, and the terms of the contract and the parties' intent become questions of fact. *Id.* "In actions tried without a jury, a district court's findings of fact are governed by the clearly erroneous standard of review." *In re Estate of Egeland*, 2007 ND 184, ¶ 6, 741 N.W.2d 724.

[¶ 44] Contracts are construed to give effect to the parties' mutual intention at the time of contracting. N.D.C.C. § 9–07–03. Parties' intentions are to be ascertained from a written contract alone if possible. N.D.C.C. § 9–07–04. A contract is interpreted as a whole so as to give effect to every part; "[e]ach clause is to help interpret the others." N.D.C.C. § 9–07–06. Words in a contract are to be interpreted in their ordinary sense. N.D.C.C. § 9–07–09. "A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." N.D.C.C. § 9–07–12. "[I]f a conflict exists between a specific provision and a general provision in a contract, the specific provision qualifies the general provision." *Oakes Farming Assoc. v. Martinson Bros.*, 318 N.W.2d 897, 908 (N.D.1982).

[¶ 45] First, Kortum asserts that the district court failed to give any effect to sub-paragraphs 6(A) and 6(B) of the

Agreement. She contends that the Agreement required the Corporation shareholders to set a price for the stock on at least an annual basis. She supports this argument by pointing to language contained in subparagraph (6)(A) of the Agreement:

> At each annual meeting of the Shareholders of the Corporation or more frequently . . . the price of a share of stock, including the worth of the company as a going concern, *shall* be fixed by the decision of a majority of the outstanding shares of the Corporation. . . .

(Emphasis added.) Since the stock price was not fixed annually by a decision of the majority of the shares of the Corporation at any of the shareholders' annual meetings, she argues that the price of each share should be its book value. She supports this assertion by pointing to language contained in subparagraph 6(B) of the Agreement, which reads in part:

> If at the annual meeting of the shareholders of the corporation, the shareholders are unable to agree upon a price as set forth in subparagraph A above, the price of each share to be sold under this Agreement shall be its book value.

Book value is defined by the Agreement as the value of a share as shown on the corporate balance sheet at the end of the month proceeding the date of termination of employment. Kortum argues that by signing the Agreement, she was only agreeing to the initial share price from the date she signed the Agreement until the next annual meeting of the shareholders or special meeting called for the purpose of fixing the share price. She contends that the district court erred because the Agreement does not state that the share price will remain the same if the shareholders fail to fix a price at the annual meeting.

[¶ 46] The Shareholders assert that subparagraph 6(B) is inapplicable unless action is taken under 6(A). Because there was no discussion regarding whether the shares should be re-priced, there was no action under 6(A). Because there was no action taken in relation to 6(A), then 6(B) would not apply. The Shareholders distinguish "not agreeing" from being "unable to agree." They contend that the stock price would not be set at book value unless the shareholders made some attempt to agree on the price and were "unable to agree." The Shareholders maintain that the district court correctly determined that the Agreement provision governing the stock price in the event that "the shareholders are unable to agree upon a price" did not apply when the shareholders never had any discussions concerning setting a price for stock. Thus, the Shareholders ask this Court to affirm the trial court's interpretation of the Agreement.

[¶ 47] When a shareholder agreement provides for periodic reevaluation of share value, that agreement signifies a bona fide intention on the part of both parties to enter into such periodic negotiations. 18A Am.Jur.2d *Corporations* § 587 (2008). However, when the parties have not reevaluated the share value as contemplated by the agreement, then the remaining shareholders have the burden of showing they did not refuse in bad faith to enter into such negotiations. *Id.*

[¶ 48] Here, the district court, in its memorandum opinion, noted, "Kortum testified that at no time prior to her termination did she ever request a review of the price of the stock. There was no testimony that any of the shareholders ever made such a request. . . . It was simply not brought up." We conclude that, by virtue of the complete inaction of the Corporation shareholders, including Kortum, regarding revaluation of the Corporation's shares of stock, the Shareholders meet their burden of showing they did not refuse in bad faith to enter into negotiations regarding the

share price. Therefore, we hold that if, on remand, after making the relevant findings of fact, the district court again concludes Kortum is not entitled to relief under N.D.C.C. § 10–19.1–115, Kortum will be entitled only to the unamended share price provided in the Agreement.

[¶ 49] Kortum also contends that the district court erroneously concluded the language "$1.00 for $25,000" in Paragraph 6 of the Agreement is more specific than the "$.04 per share" language found both in Paragraph 6 of the Agreement and in the Agreement's Schedule A. Thus, Kortum argues the district court erred by construing the Agreement to require the Corporation to pay Kortum $1.00 for her $25,000 investment. Kortum asserts she should have been paid $.04 for each of her 5,000 shares, a total payment of $200.

[¶ 50] The Shareholders argue the district court correctly concluded that, under the plain language of the Agreement, the price of the shares is $1.00, subject to any adjustments that are made under the Agreement's subparagraphs 6(A) and 6(B).

[¶ 51] We agree with Kortum. We hold that the more specific price provision is the price of $.04 per share or $200 total. Significantly, this price is listed in the text of section 6 of the Agreement and is again handwritten as the share price in Schedule A of the Agreement both for transfers of stock upon the death of a shareholder and for lifetime transfers of stock.

[¶ 52] We, therefore, hold that if, on remand after making the relevant findings of fact, the district court again concludes Kortum is not entitled to relief under N.D.C.C. § 10–19.1–115, Kortum will be entitled only to the unamended share price of $.04 per share, or $200 for her total ownership interest of 5,000 shares, provided in the Agreement.

## IV

### Conclusion

[¶ 53] We hold that the Shareholders owed Kortum a duty of utmost loyalty and good faith. Kortum did not "bargain away" the duty she was owed by the Shareholders by signing the Agreement. The Agreement is, however, presumed to reflect Kortum's reasonable expectations. Because the district court did not make findings relevant to the determination of whether the Shareholders acted in a manner unfairly prejudicial to Kortum, we cannot determine as a matter of law whether Kortum is entitled to relief under N.D.C.C. § 10–19.1–115, and we reverse and remand.

[¶ 54] We further hold that if, on remand after making the relevant findings of fact, the district court concludes Kortum is not entitled to relief under N.D.C.C. § 10–19.1–115, Kortum will be entitled only to the share price provided in the Agreement. We interpret the Agreement to provide a share price of $0.04 per share.

[¶ 55] We, therefore, reverse the district court judgment and remand for further proceedings consistent with this opinion.

[¶ 56] GERALD W. VANDE WALLE, C.J., and CAROL RONNING KAPSNER, JJ., concur.

CROTHERS, Justice, concurring in part and dissenting in part.

[¶ 57] I concur with Part III of the Majority Opinion relating to interpreting the ambiguity in the Buy–Sell Agreement share price provision. I respectfully dissent from the remainder of the Majority Opinion.

[¶ 58] I do not agree the district court's decision was induced by an erroneous view

of the law. Majority Opinion at ¶ 41. Nor do I agree the district court misapplied the law or failed to perform the analysis required under the North Dakota Business Corporation Act. *Id.* Rather, I think the Majority answers unnecessary questions and too easily surrenders to Minnesota and Massachusetts case law before articulating what, if any, gaps exist in our jurisprudence that require importation of substantive legal principles from those foreign adjudications.

[¶ 59] The Majority Opinion appears to be premised on the incorrect notion that the district court erred by failing to "determine whether [Kortum] was unfairly prejudiced under N.D.C.C. § 10–19.1–115(1)(b)(3)." Majority Opinion at ¶ 20. Careful attention to the structure and direction of N.D.C.C. § 10–19.1–115 as a whole shows that the district court followed the law. That section provides, "A court *may* grant any equitable relief it deems just and reasonable in the circumstances...." N.D.C.C. § 10–19.1–115(1) (emphasis added). Therefore, even if relief might be warranted under the terms of the statute, award of that relief is addressed to the district court's discretion. *Brandt v. Somerville*, 2005 ND 35, ¶ 10, 692 N.W.2d 144.

[¶ 60] But the statute does not leave the district court *tabula rasa* to determine whether equitable relief can be granted. Before deciding whether it can favorably exercise its discretion under N.D.C.C. § 10–19.1–115, the district court must apply and comply with terms of the statute, which I believe it did. Key among terms of the statute is the subsection providing:

"In determining whether to order equitable relief or dissolution, the court shall take into consideration the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner

in the operation of the corporation and the reasonable expectations of the shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other. *For purposes of this section, any written agreement, including an employment agreement and a buy-sell agreement, between or among shareholders or between or among one or more shareholders and the corporation is presumed to reflect the parties' reasonable expectation concerning the matters dealt with in the agreement.*"

N.D.C.C. § 10–19.1–115(4) (emphasis added).

[¶ 61] The Legislature did not give courts a free hand to determine "the parties' reasonable expectation." *See id.* The Legislature instead directed that the court presume documents executed by the parties reflect their actual intentions. *Id.* The Legislature also directed that "[a] written agreement among the shareholders of a corporation and the subscribers for shares to be issued, relating to the control of any phase of the business and affairs of the corporation, its liquidation and dissolution, or the relations among shareholders of or subscribers to shares of the corporation is valid and specifically enforceable...." N.D.C.C. § 10–19.1–83(1).

[¶ 62] These portions of the Business Corporation Act were created to allow shareholders to agree, while they were agreeable, to terms governing the financial consequences of their business affairs if the shareholders' relations subsequently disintegrated. By failing to allow the district court to give legal effect to the presumptive effect of the shareholders' agreement, the Majority erodes the certainty of contract and dilutes the Legislature's clear intent to allow shareholders to control

their future through a pre-dispute agreement.

[¶ 63] The controlling document in this case was created by the parties to manage their shareholder relations. By law, those terms are valid and "specifically enforceable." N.D.C.C. § 10–19.1–83(1). According to the Buy–Sell Agreement, the shareholders, all medical doctors, presumably acting on legal advice, promised to each other:

> *"Termination of employment.* If any Shareholder shall voluntarily or involuntarily terminate his employment with the Corporation, for any reason whatsoever, he shall sell his shares under the terms and conditions as set forth in paragraph 1 hereof."

[¶ 64] This term is clear beyond dispute—any shareholder may be involuntarily separated from employment "for any reason whatsoever"—that is with or without cause. The district court correctly described this employment status as "at will." If separation from employment occurs, the shareholder is obligated under the Agreement to sell his or her shares according to the terms in paragraph 1 of the Agreement and the corporation is obligated to tender the agreed upon share price. Although a written agreement likely will not be enforceable as a matter of law in all situations, here I believe this clear term of the Agreement leaves no room for Kortum's claim she had, or could have, any "reasonable expectation" of continuing employment. I further believe this clear term leaves no reason to reverse the district court and no basis for the district court to conduct further proceedings on remand.

[¶ 65] The Majority disagrees and not only concludes the district court's handling of this case was flawed, but that its reliance on *Coleman v. Taub*, 638 F.2d 628 (3d Cir.1981), was "misplaced." Majority

Opinion at ¶ 36. To the contrary, the district court's analysis was correct in that the parties' Buy–Sell Agreement left no room for expectations hostile to the express contractual terms, and in that relief was not available to Kortum under N.D.C.C. § 10–19.1–115. Moreover, the district court's reliance was not "misplaced." If anything, the district court's reliance on the *Coleman* opinion was understated for not relying on that portion, stating: "[W]here all shares of the corporation are owned by only two shareholders and the public is not affected, there is no reason why an appeal to general fiduciary law should be used by either party as a pretext for evading his contractual obligations." *Id.* at 636.

[¶ 66] Further direction can be taken from the *Coleman* court where it criticized the district court's grant of relief, stating:

> "In so doing, it summarily disregarded Coleman's contractual commitment to Mr. Taub. This was not a contract to be found in the fine print of documents designed to govern rights between a publicly traded corporation and the passive investing public. Rather, the parties here carefully agreed to this language in the context of a close business relationship. The parties entered into that undisputed commitment at the time of Coleman's employment and prior to his acquisition of ten shares of stock in this small, close corporation consisting of only two stockholders. Coleman has not complained that paragraph 11 is invalid. Such repurchase options 'have been recognized as serving a number of legitimate business purposes, including restrictive ownership of corporate stock and have been generally upheld by the courts.' The circumstances attending the sale of the stock and the unconditional requirement that Coleman commit himself to sell it back in the event of his

termination of employment 'for any reason whatsoever' leave little doubt that Old Taub intended to avoid under all circumstances the risk of disruption from a dissident, disaffected ex-employee. *On the other hand, Coleman bargained for the right to be a shareholder only while he remained an employee. He did not bargain for the privilege of being a dissident, litigious, outside minority stockholder and the obvious purpose of the buy-back clause was undoubtedly to avoid such a situation.* If that was not the obvious purpose of the restrictive clause, it is at least a fair and reasonable inference to which defendants were entitled on a summary judgment motion. Such a purpose is practical, not uncommon, and not improper." 638 F.2d at 637 (emphasis added) (citations and footnote omitted).[4]

[¶ 67] Returning to analysis of N.D.C.C. § 10–19.1–115, the Majority would have us ignore the explicit wording of the Buy–Sell Agreement in search of an answer to the unnecessary question whether, by enforcement of that Agreement, the corporation and the remaining officers and directors "acted in a manner unfairly prejudicial toward Kortum in her capacity as a shareholder-employee." Majority Opinion at ¶ 21. Doing so, the Majority strays from the structure and wording of the statute which requires, as a condition precedent to the "unfairly prejudicial" inquiry, that "one or more of the circumstances described in that subdivision [10–19.1–115(1)(b) ] is established." N.D.C.C. § 10–19.1–115(3). Kortum could not sustain that burden because she had no expecta-

tion of continued employment. Rather, she made a binding promise in the Buy–Sell Agreement to surrender her shares if her employment was terminated "for any reason whatsoever."

[¶ 68] Kortum's employment was terminated, and the corporation subsequently tendered the share price and demanded that Kortum surrender her shares in compliance with her contractual obligation. The district court made the following findings of fact:

"4. At the time the corporation was formed, Kortum and the individual Defendants knowingly signed a Buy–Sell Agreement.

"5. Pursuant to the Buy–Sell Agreement, if any shareholders' employment was terminated voluntarily or involuntarily, for any reason whatsoever, that shareholder was required to sell his or her 5,000 shares to the Corporation for $1.00.

"6. Kortum did not have an employment contract with the Corporation.

"7. Kortum was an employee at-will.

"8. Kortum's employment with the Corporation was involuntarily terminated on or about December 19, 2005.

"9. At the time of the termination, the Corporation offered to buy Kortum's 5,000 shares for $1.00, pursuant to the Buy–Sell Agreement."

[¶ 69] The district court's findings demonstrate to me that it understood and properly applied the law to the facts of this case. Granted, the district court could have more clearly articulated its analysis

---

**4.** Also curious is that the Majority characterizes the district court's reliance on *Coleman* "misplaced," yet the Majority relies on the Minnesota Court of Appeals decision of *Berreman v. West Pub. Co.*, 615 N.W.2d 362, 375 (Minn.Ct.App.2000). Majority Opinion at ¶ 31. *Berreman* favorably cites and relies on the *Coleman* decision, not for a probing analysis of how or when an employee became a share holder but for the simple proposition "that shareholder who signed buy-back agreement bargained for right to be shareholder only while employed." *Berreman*, at 375.

under terms of the statute. However, this Court should not reverse based on the district court's failure to parrot "magic words" of the controlling law. Moreover, Kortum is not asserting the district court's findings are clearly erroneous, save the share price issue. Therefore, rather than reversing, this Court should be affirming the district court's application of N.D.C.C. § 10–19.1–115 and affirming the district court's judgment denying Kortum relief and dismissing this action based on current North Dakota law.

[¶ 70] In reaching its decision, the Majority cites *Schumacher v. Schumacher*, 469 N.W.2d 793 (N.D.1991), and *Balvik v. Sylvester*, 411 N.W.2d 383 (N.D.1987), for a description of a close corporation's shareholders' common law and statutory duties to one another. *See* Majority Opinion at ¶ 27. Not mentioned is that *Balvik* was decided under prior law, repealed in 1985, and that *Schumacher* relied on *Balvik*. *See Balvik*, at 385 n. 2; *Schumacher*, at 797. The Majority also does not account for our recent holding under current law that "because the legislature has provided extensive standards and remedies for violation of minority shareholders' rights, there is no separate common law duty. . . ." *Lonesome Dove Petroleum, Inc. v. Nelson*, 2000 ND 104, ¶ 29, 611 N.W.2d 154 (footnote omitted).

[¶ 71] The Majority attempts to dismiss this concern of mine by invoking footnote one of the *Lonesome Dove* opinion which states, "[C]ommon law as expressed in previous decisions of this Court may provide guidance in defining the parameters of the fiduciary dut[y]. . . ." Majority Opinion at ¶ 14 n. 1 (citing *Lonesome Dove*, at ¶ 29 n. 1). While it is tempting to try on this cloak of "guidance," the notion should be cast aside because of our law providing: "In this state there is no common law in any case in which the law is declared by the code." N.D.C.C. § 1–01–06.

[¶ 72] Similarly, the Majority's aggressive importation of common law by way of citation to Minnesota cases is antithetical to the operation of North Dakota law which provides that N.D.C.C. ch. 10–19.1 displaced the common law. While it is true our Business Corporation Act was modeled after Minnesota's Act, Majority Opinion at ¶ 22, Minnesota's judicial opinions cited by the Majority were decided after North Dakota adopted N.D.C.C. ch. 10–19.1, and even after material modifications were made to N.D.C.C. § 10–19.1–115 in 1995. *See* 1985 N.D. Sess. Laws ch. 147 and 1995 N.D. Sess. Laws ch. 103, § 43. Therefore, when North Dakota adopted statutory provisions similar to those in Minnesota, it cannot be said North Dakota also adopted Minnesota's subsequent widespread utilization of the common law.

[¶ 73] The Majority's reliance on Minnesota judicial decisions most prominently includes citation to *Gunderson v. Alliance of Computer Prof., Inc.*, 628 N.W.2d 173 (Minn.Ct.App.2001). *Gunderson* is cited at least 18 times by the Majority. It cites *Gunderson* for a host of propositions ranging from the shareholders' mutual duties to Minnesota's application of its "reasonable expectation" test. *See* Majority Opinion at ¶¶ 28 and 29, respectively. Not mentioned, however, is that like Kortum in the instant case, Gunderson signed an agreement "specifically provid[ing] for the involuntary removal of shareholders with or without cause." *Gunderson*, at 186. Based on that unequivocal term, the Minnesota court held "no rational factfinder could conclude that the agreement did not reflect his reasonable expectations as a shareholder." *Id.*

[¶ 74] Dismissal of Kortum's claims of unmet "reasonable expectations" and "un-

fairly prejudicial" corporate conduct should be affirmed, just like dismissal of Gunderson's similar claims was affirmed. *See id.* at 189. Because the Majority does not do so and for the other reasons articulated above, I respectfully dissent from the application of N.D.C.C. § 10–19.1–115 and from remand of the case on this issue.

[¶ 75]   Daniel J. Crothers

SANDSTROM, Justice, concurring in part and dissenting in part.

[¶ 76]   Like Justice Crothers, I would affirm the judgment of the district court, except to remand to the district court to modify the judgment to reflect $200.00 rather than $1.00 as the amount Independent Family Doctors, Ltd., is to pay Kortum for her stock.

[¶ 77]   Dale V. Sandstrom