2000 ND 104

**LONESOME DOVE PETROLEUM, INC., Plaintiff and Appellee,**

v.

**Charles Schreiner NELSON, Defendant and Appellant,**

v.

**Brett Boedecker, Susanne Boedecker, Michael Flinn, Phoenix Energy Companies, Inc., Defendants on Cross-claim and Appellees.**

No. 990272.

Supreme Court of North Dakota.

May 25, 2000.

Lyle W. Kirmis (argued) and Lawrence A. Dopson, Zuger Kirmis & Smith, Bismarck, and Joseph H. Kubik (appearance), Kubik, Bogner, Ridl & Selinger, Dickinson, for plaintiff and appellee and defendants on crossclaim and appellees.

Ronald H. McLean (argued), Serkland, Lundberg, Erickson, Marcil & McLean, Ltd., Fargo, and Marvin L. Kaiser (appearance), Williston, for defendant and appellant.

SANDSTROM, Justice.

[¶ 1] Charles Schreiner Nelson appeals from a judgment finding Nelson and Lonesome Dove Petroleum, Inc. ("Lonesome Dove") had entered into a valid contract for redemption of Nelson's shares in the company and finding no breach of a fiduciary duty owed to Nelson. Concluding the trial court's findings of fact are not clearly erroneous, we affirm.

I

[¶ 2] Lonesome Dove was formed in 1993. Nelson and Michael Flinn each provided approximately half of the original $80,000 capital contribution, and each received one-third of the stock. The remaining one-third was held by Susanne Boedecker. Her husband, Brett, oversaw the day-to-day operations of the company.

[¶ 3] The original $80,000 was largely invested in oil properties. In late 1994, Brett Boedecker suggested Nelson and Flinn invest additional sums so Lonesome Dove could purchase mineral leases in the Dickinson area in what the parties refer to as "the Lodgepole play." Nelson and Flinn refused, and suggested Boedecker find an outside source of funding for these additional purchases.

[¶ 4] Brett Boedecker contacted a friend, Thomas Cabe, who owned Phoenix Energy Companies, Inc. ("Phoenix"). In January 1995, Boedecker negotiated an agreement whereby Phoenix would provide $250,000 in funding for Lonesome Dove to procure mineral interests in Phoenix's name. Lonesome Dove was to receive twenty percent of all profits, royalty interests, and working interests after Phoenix received payback. Phoenix subsequently furnished additional, substantial sums to purchase leases in the Lodgepole play.

[¶ 5] In March 1995, Phoenix sold some of the Lodgepole leases to Trans America National Gas Corporation ("Trans America") and granted an option to Trans America on the remaining leases. Trans America assigned its rights to Trans Texas

Gas Corporation ("Trans Texas"), and Trans Texas exercised the option to purchase additional leases. As a result of these agreements, Phoenix received payback on its investment and substantial profits were generated. Lonesome Dove received twenty percent of Phoenix's profits, royalties, and working interests.

[¶ 6] Because these activities had created large profits for Lonesome Dove, Nelson, Flinn, and the Boedeckers discussed options to reduce tax consequences. In addition, some conflicts had arisen between Nelson and the others, particularly over a proposal that the Boedeckers receive additional stock for their efforts in the company's success. A proposal to liquidate Lonesome Dove and distribute the assets to the shareholders was rejected in July 1995. Nelson then proposed that Lonesome Dove redeem his stock by distributing to him one-third of the company's assets.

[¶ 7] On August 28, 1995, Nelson sent a letter to Lonesome Dove confirming an agreement to withdraw one-third of the assets:

This letter is confirmation to withdraw at a non-discounted price all of my one-third (⅓) assets including cash, overrides, working interest, royalties, mineral, and other assets from Lonesome Dove. This will be beneficial to me from a tax standpoint.

I would suggest we make this transition effective either September 1, 1995 or October 1, 1995 to allow adequate time for assignments, work in progress, etc. I understand we are in the process of purchasing minerals and leases....

Please let me know how you would like to handle this asset withdrawal. There is some tax planning for me so let me know if this arrangement is satisfactory.

Lonesome Dove replied by letter dated September 6, 1995:

Lonesome Dove is in agreement to redeem your shares of stock with a cut off date for leases purchased and leases sold as of September 1, 1995. Lonesome Dove will have ⅓ of all working interest and royalty overrides associated with the recent Phoenix–Trans Texas transaction and recently acquired leases transferred directly to your designated corporation. In addition you will be paid ⅓ of the cash from the sale less amounts paid or to be paid for minerals; seismic expenses; salaries, employment taxes; professional and other expenses and corporation income taxes. Income taxes on the assets distributed to you will be subtracted from your share of the cash.

While a discount for minority interest would be typical, the remaining shareholders and board members concluded not to apply a minority discount to your redemption.

Nelson responded on September 11, 1995:

I received your September 6, 1995 letter on Friday, September 8, 1995. There are several issues that will need to be resolved prior to my withdrawal from Lonesome Dove. Please ask Tom Kel[s]ch to contact my attorney, Mr. Randy Fields, in San Antonio at the address listed below....

[¶ 8] Over the next several months, the parties' attorneys conducted negotiations on various terms of the agreement. On December 15, 1995, Lonesome Dove's attorney, Thomas Kelsch, sent a letter to Randy Fields, Nelson's attorney, outlining the mineral interests which had already been transferred to Nelson and the remaining mineral interests to be transferred. The letter concluded:

It is the intention of Lonesome Dove that the transfer of Schreiner's ⅓ interest in Lonesome Dove be effective in 1995, even though the actual deed of the minerals or assignment of the royalty or working interests may not occur until 1996. Lonesome Dove requests that Schreiner sign his stock back to Lonesome Dove on or before December 31, 1995. As we discussed in our telephone conference, Lonesome Dove intends to

elect Subchapter S status for 1996 and if Schreiner has not transferred his interest before that time, Schreiner's approval of the election would be requested.

. . . .

I believe this accurately reflects the intent and agreement between Schreiner and Lonesome Dove. If you have any questions or changes concerning that, please contact me. I have placed an acceptance of these terms, signature and approval contained in this letter for signature by Brett, President of Lonesome Dove, and by Schreiner. If these terms are acceptable and both parties sign this letter of understanding, I believe that that would be sufficient to transfer the interests prior to year end. It may be advisable that I prepare a formal agreement to document this transfer. To date, we only have letters going back and forth between Lonesome Dove and Schreiner to show the agreement. I would request that you fax me any provisions that you would suggest should be in such a transfer agreement as soon as possible. Please contact me if you have any questions concerning the same.

Fields responded on December 20, 1995:

I have discussed this matter with Mr. Nelson. Your letter is acceptable with the exception that Mr. Nelson will not turn in his stock certificate in Lonesome Dove, Inc. until the final assignments have been made. In the meantime, if Lonesome Dove plans to elect Subchapter S status as of January 1, 1996, Mr. Nelson will agree to execute the Subchapter S election form.

[¶ 9] Lonesome Dove responded by letter dated December 21, 1995, accepting Nelson's condition the stock certificate not be returned until transfer of the mineral interests was completed. Lonesome Dove thereafter completed the transfer of those interests, but Nelson refused to return the stock certificate. The parties completed an accounting showing Lonesome Dove owed Nelson $57,894 as his share of the cash, and Lonesome Dove tendered this amount to Nelson. Nelson refused to accept it.

[¶ 10] In 1996 and 1997, after the effective date of the alleged agreement, Lonesome Dove and Phoenix acquired valuable mineral interests in what is described as the Stadium Field. Nelson claims he is still a one-third owner of Lonesome Dove and is entitled to share in the profits of those transactions.

[¶ 11] In 1997, Lonesome Dove brought this action against Nelson seeking specific performance requiring Nelson to convey his stock certificate. Nelson answered, denying an agreement had been reached, and filed a counterclaim against Lonesome Dove and cross-claims against Flinn, the Boedeckers, and Phoenix, alleging breach of fiduciary duty and other claims.

[¶ 12] After a five-day trial, the trial court found the parties had assented to the terms of an enforceable agreement to redeem Nelson's stock and there had been no breach of a fiduciary duty owed to Nelson. The court ordered Nelson to convey his stock certificate to Lonesome Dove, ordered Lonesome Dove to pay Nelson $57,894 in accordance with the parties' accounting, and dismissed Nelson's claims against all other parties.

[¶ 13] Nelson filed a timely notice of appeal under N.D.R.App.P. 4(a). The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 28–27–01.

II

[¶ 14] Nelson asserts the trial court erred in finding the parties mutually assented to the terms of an enforceable agreement to redeem his shares in Lonesome Dove.

A

[¶ 15] The existence of a contract is a question of fact for the trier of fact.

*Stout v. Fisher Industries, Inc.*, 1999 ND 218, ¶ 11, 603 N.W.2d 52; *Jones v. Pringle & Herigstad, P.C.*, 546 N.W.2d 837, 842 (N.D.1996). The trier of fact determines whether a contract is intended to be a complete, final, and binding agreement. *Jones*, at 842. Our review of these questions is governed by the "clearly erroneous" standard under N.D.R.Civ.P. 52(a). *Jones*, at 842. Under that standard, a finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made. *Bleth v. Bleth*, 2000 ND 52, ¶ 8, 607 N.W.2d 577.

[¶ 16] The trial court found the parties had mutually assented to terms for redemption of Nelson's shares, resulting in a binding, enforceable agreement. The court made extensive, detailed findings about the formation and existence of the agreement:

20. On September 6, 1995, Lonesome Dove offered to redeem the shares of Nelson. Lonesome Dove offered, using a cutoff date of September 1, 1995, to redeem the shares of Nelson in exchange for a conveyance to Nelson of one-third of all working interest and royalty overrides acquired by Lonesome Dove on account of the Phoenix/Lonesome Dove Agreement, with the working interest and royalty overrides being transferred directly to Nelson or his designated corporation. In addition, Lonesome Dove offered to pay one-third of all of the cash received from Lonesome Dove from the Phoenix/Lonesome Dove Agreement, less amounts paid or to be paid for minerals, seismic expenses, salaries, employment taxes, professional and other expenses and corporate income taxes and also less income taxes paid by Lonesome Dove on assets distributed to Nelson as part of the redemption of his stock.

21. On September 11, 1995, Nelson conditionally accepted the September 6, 1995, offer of Lonesome Dove subject to any unresolved issues being negotiated between Nelson's attorney, Mr. Randy Fields, and Lonesome Dove's attorney, Mr. Tom Kelsch.

22. From September 11, 1995, through December 20, 1995, negotiations occurred between Randy Fields and Tom Kelsch as to all issues related to the redemption of Nelson's stock. Nelson was kept fully advised by Randy Fields as to these negotiations. On December 15, 1995, Lonesome Dove's attorney, Tom Kelsch, set out in writing in a letter to Randy Fields his understanding and confirmation of the agreements that had been reached between Lonesome Dove and Nelson relating to the redemption of Nelson's stock. Pursuant to that letter, Lonesome Dove, acting through Kelsch, confirmed that all working interests and royalty interests had been, or were in the process of being, transferred to Nelson's designated corporation, Lodgepole, LLC; and further confirmed that the agreement that had been reached between Nelson and Lonesome Dove was that upon transfer of these royalty interests and working interests, Nelson would return all of the stock held by him in Lonesome Dove to Lonesome Dove. Lonesome Dove, acting through Kelsch, further confirmed that Tom Kelsch's letter of December 15, 1995, accurately set out the agreement between Nelson and Lonesome Dove except to the extent Nelson disagreed with any of the terms of the letter.

23. On December 20, 1995, Randall Fields, acting as attorney-in-fact

for Nelson, confirmed that the December 15, 1995, letter of Tom Kelsch setting forth the agreement of Lonesome Dove and Nelson was acceptable to Nelson with one exception. The exception was that Nelson would not return his stock certificate in Lonesome Dove until final assignments of royalty interests and working interests had been completed. This condition was immediately accepted by Lonesome Dove.

. . . .

26. Lonesome Dove, pursuant to the agreements between Lonesome Dove and Nelson, transferred to Nelson that percentage of royalty interests and working interests acquired by Lonesome Dove on account of the Phoenix/Lonesome Dove Agreement to which Nelson was entitled pursuant to his redemption agreement with Lonesome Dove. Nelson has accepted the assignments of those interests and received the benefit of those assignments.

27. As of December 20, 1995, the terms of the redemption of Nelson's stock were fully understood by Lonesome Dove and Nelson, and there was mutual assent to those terms.

### B

■ [¶ 17] Nelson contends the written documents show the parties contemplated a final written contract and his failure to sign such a contract demonstrates a lack of mutual assent. Nelson argues the language and form of Kelsch's December 15, 1995, and December 21, 1995, letters indicate a signed writing was necessary before the parties would be bound. These letters contained signature lines for Nelson to indicate his acceptance, and the text of both letters stated: "It may be advisable that I prepare a formal agreement to document this transfer."

■ [¶ 18] Where the parties have agreed on the essential terms of a contract, the fact they contemplated a further writing memorializing the agreement does not prevent enforcement of the contract. The principle is stated in Restatement (Second) of Contracts § 27 (1981):

Existence of Contract Where Written Memorial is Contemplated

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

See also Davis v. Roberts, 563 N.W.2d 16, 22 (Iowa Ct.App.1997); McCarthy v. Tobin, 429 Mass. 84, 706 N.E.2d 629, 632 (1999); Greer v. Kooiker, 312 Minn. 499, 253 N.W.2d 133, 140 (1977); Mazzella v. Koken, 559 Pa. 216, 739 A.2d 531, 536 (1999).

■ [¶ 19] This Court recognized the principle in an early case:

If there is an offer and an acceptance, a meeting of the minds of the parties, then it follows that a contract has been made though there is no writing. And the fact that it is agreed that its terms shall be reduced to writing and signed does not make an oral agreement any the less a contract unless it is further expressly or impliedly stipulated that until the writing is executed the parties are not to be bound. If it appears that the parties to a negotiation did not intend to be bound until the resulting agreement, however definitely arrived at, should be reduced to writing and signed, there is no contract until that is done. But the burden of establishing that a contract otherwise sufficient was not to be considered as complete until reduced to writing and signed, rests upon him who on that account denies the obligations thereof.

Metzler v. O.J. Barnes Co., 58 N.D. 455, 462, 226 N.W. 501, 503 (1929) (citations

omitted); *see also Bjornson v. Five Star Mfg. Co.,* 61 N.W.2d 913, 915 (N.D.1953). These cases clarify it is the intent of the parties which controls, and a binding agreement is created unless the parties intended there be no agreement until a writing is signed.

[¶ 20] The trial court in this case specifically found the parties did not make a signed writing a condition of acceptance:

> Nelson contends that a condition of the agreement between Lonesome Dove and Nelson was that the final agreement between Lonesome Dove and Nelson, including all of the provisions thereto, be reduced to a written document which would have to be executed by Nelson. While such a document was contemplated as a possibility, it was not specifically agreed that the terms would be reduced to writing and signed by Nelson. In addition, it was never expressly or impliedly stipulated that until a written agreement was executed by Nelson, Nelson would not be bound.

There is ample evidence in the record to support the trial court's finding, and the finding is not clearly erroneous. Because the parties did not intend they would not be bound until a signed written agreement was executed, the lack of a signed writing does not preclude enforcement of the parties' agreement.

## C

■ [¶ 21] Nelson argues the parties never reached a meeting of the minds on the terms of the contract, and contends there were several conditions precedent which were to be met before an obligation would be imposed. He argues his acceptance was therefore conditional and did not bind him to the terms of the December 15 or 21 letters.

[¶ 22] Kelsch's December 15 letter stated Lonesome Dove's understanding of the terms of the agreement and requested Fields or Nelson contact Kelsch if there were any concerns about those terms. Fields responded on Nelson's behalf, and

stated: "Your letter is acceptable with the exception that Mr. Nelson will not turn in his stock certificate in Lonesome Dove, Inc. until the final assignments [of mineral interests] have been made." No other conditions were raised. When Lonesome Dove subsequently agreed to Nelson's one condition, a binding agreement was formed and Nelson had assented to its terms.

[¶ 23] Any doubt Nelson assented to the terms of the agreement is erased by Nelson's acceptance of the assignments of mineral interests as outlined in Kelsch's letters. This Court has held a flexible test of acceptance and mutual consent, rather than the mirror-image rule, is applicable when there has been partial performance and transfer of possession of property. *See Kuntz v. Kuntz,* 1999 ND 114, ¶ 7, 595 N.W.2d 292; *Stonewood Hotel Corp. v. Seven Seas, Inc.,* 452 N.W.2d 94, 95 (N.D. 1990); *Stonewood Hotel Corp. v. Davis Development, Inc.,* 447 N.W.2d 286, 291 n. 2 (N.D.1989).

[¶ 24] Our statutory provisions recognize voluntary acceptance of consideration or benefits of a transaction constitutes assent to the proposed terms:

> *9-03-20. Acts constituting acceptance.* Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal.

> *9-03-25. Acceptance of benefit equivalent to consent.* A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or ought to be known to the person accepting.

The same principle is expressed in Restatement (Second) of Contracts § 69(2) (1981):

> Acceptance by Silence or Exercise of Dominion

> . . . .

> (2) An offeree who does any act inconsistent with the offeror's ownership of offered property is bound in accor-

dance with the offered terms unless they are manifestly unreasonable.

[¶ 25] Lonesome Dove transferred mineral interests to Nelson in accordance with the terms outlined in Kelsch's December letters. Nelson accepted the mineral interests and recorded them. Nelson's acceptance of the mineral interests constituted an acceptance of the proffered terms of the agreement.

[¶ 26] We conclude the trial court's findings that the parties had mutually assented to the terms of a binding, enforceable agreement are not clearly erroneous.

### III

[¶ 27] Nelson asserts the trial court erred in finding Flinn and the Boedeckers did not breach fiduciary duties owed to Nelson as a minority stockholder.

### A

[¶ 28] Nelson asserts the trial court erred in failing to make findings of fact on the common law fiduciary duty of majority shareholders and directors to minority shareholders in a closely held corporation. Nelson argues the common law standards are more stringent than those found in N.D.C.C. ch. 10–19.1, which the trial court applied.

[¶ 29] Chapter 10–19.1, N.D.C.C., the North Dakota Business Corporation Act, sets out standards of conduct for officers, directors, and those in control of corporations, and provides remedies for violations of those standards. *See, e.g.,* N.D.C.C. §§ 10–19.1–50, 10–19.1–60, 10–19.1–85.1, 10–19.1–115. Our legislature has declared "there is no common law in any case where the law is declared by the code." N.D.C.C. § 1–01–06. Accordingly, because the legislature has provided extensive standards and remedies for violation of minority shareholders' rights, there is

no separate common law duty, and the trial court did not err in failing to make findings of fact on the alleged common law duty.[1]

### B

[¶ 30] Chapter 10–19.1, N.D.C.C., imposes a duty upon officers, directors, and those in control of a corporation to act in good faith, and affords remedies to minority shareholders if those in control act fraudulently, illegally, or in a manner unfairly prejudicial toward any shareholder. *See* N.D.C.C. §§ 10–19.1–50(1), 10–19.1–60, 10–19.1–115(1)(b). Nelson argues the trial court erred in finding Flinn and the Boedeckers did not violate these statutory duties owed to him as a minority shareholder.

[¶ 31] In support of his argument, Nelson contends the other principals in Lonesome Dove took steps to freeze him out of the corporation, and ultimately removed him from Lonesome Dove's Board of Directors. Much of Nelson's argument is premised upon his assertion that, because there never was a binding agreement to redeem his shares, he is still a shareholder. Thus, Nelson complains his removal from the Board of Directors in 1996 constituted bad faith, was unfairly prejudicial, and froze him out of the corporation's affairs. However, because we have affirmed the trial court's determination there was a valid agreement redeeming his shares in exchange for a portion of the assets, Nelson was effectively no longer a shareholder when the remaining directors voted to remove him from the Board in 1996.

[¶ 32] Nelson also argues an August 23, 1995, letter from corporate counsel Kelsch to Flinn and the Boedeckers evidences bad faith and breach of fiduciary duty. In this letter, Kelsch addressed the disharmony among the shareholders and

---

1. Although there is no longer a separate common law fiduciary duty, N.D.C.C. ch. 10–19.1 codifies many of the duties previously imposed under the common law. Therefore, the common law as expressed in previous decisions of this Court may provide guidance in defining the parameters of the fiduciary duties owed by directors, officers, and minority shareholders under N.D.C.C. ch. 10–19.1.

outlined legal options for the corporation if the disagreements could not be resolved. Among the options addressed is removal of Nelson as a director, issuance of additional stock, and possible exit of Brett Boedecker from the company.

[¶ 33] We find it unnecessary to address whether any of these actions, if carried out while Nelson was still a shareholder, would have constituted a statutory violation under N.D.C.C. ch. 10–19.1, because Flinn and the Boedeckers did not in fact act on Kelsch's suggestions. The parties resolved the matter by reaching an agreement to redeem Nelson's shares in the corporation. Only after an agreement had been reached, and Nelson was effectively no longer a shareholder, did the remaining directors vote to remove Nelson from the Board. Nelson clearly suffered no damages or injury by Flinn and the Boedeckers' mere consideration of the options outlined by Kelsch. As we recently noted, "courts do not ' "sit for the purpose of enforcing moral obligations or correcting unconscientious acts which are followed by no loss or injury," ' " for to do so would be "tantamount to an advisory opinion." *Lang v. Schafer*, 2000 ND 2, ¶ 8, 603 N.W.2d 904 (quoting *Sonnesyn v. Akin*, 14 N.D. 248, 256, 104 N.W. 1026, 1028 (1905)).

[¶ 34] We conclude the trial court's findings of fact that Flinn and the Boedeckers did not violate any duty owed to Nelson under N.D.C.C. ch. 10–19.1 are not clearly erroneous.

### IV

[¶ 35] We have considered the remaining issues raised by Nelson and find them to be without merit. The judgment is affirmed.

[¶ 36] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, MARY MUEHLEN MARING, CAROL RONNING KAPSNER, JJ., concur.