2013 ND 196

**Reed H. DANUSER, Plaintiff
and Appellee**

v.

**IDA MARKETING CORPORATION;
IDA of Moorhead Corporation; James
Leach, Steve Leach, David P. Gruen-
hagen, and Val Tareski, Defendants**

**IDA Marketing Corporation; IDA of
Moorhead Corporation; James
Leach, Appellants.**

No. 20120443.

Supreme Court of North Dakota.

Oct. 30, 2013.

Rehearing Denied Nov. 25, 2013.

Ronald H. McLean (argued) and Peter W. Zuger (appeared), Fargo, N.D., for plaintiff and appellee.

Michael D. McNair, Fargo, N.D., for defendant and appellant IDA of Moorhead Corporation.

Robert B. Stock (argued) and Vanessa L. Anderson (appeared), Fargo, N.D., for defendant and appellant James Leach.

MARING, Justice.

[¶ 1] James Leach, IDA Marketing Corporation, and IDA of Moorhead Corporation appeal from a judgment holding them jointly and severally liable to Reed Danuser in the amount of $692,671.78 for claims involving Danuser's termination as president and chief executive officer of the corporations and Leach's breach of a fiduciary duty to Danuser and requiring IDA Moorhead to pay Danuser $130,727.99 for loans he made to IDA Moorhead. We affirm.

## I

[¶ 2] Before 1994, Leach was the president and majority shareholder of IDA Moorhead, a corporation he created as the sole shareholder in 1977 to manufacture electronic communications equipment. By 1994, Leach had handed over the day-to-day operations of IDA Moorhead to its four managers, Danuser, John Kruse, Steven Lee, and David Gruenhagen. In 1994, Danuser, Kruse, Lee, and Gruenhagen, as sole shareholders, incorporated IDA Marketing to buy Leach's shares of stock in IDA Moorhead. Several agreements were executed to effectuate the transaction, including a stock purchase agreement, a security agreement, a marketing agreement, and a shareholder control agreement.

[¶ 3] Under the stock purchase agreement between IDA Marketing and James Leach, Leach sold his 2,421,118 shares of IDA Moorhead to IDA Marketing for 31 cents per share. The agreement recognized there were 3,794,500 total outstanding shares of IDA Moorhead. In exchange for Leach's shares of stock in IDA Moorhead, the stock purchase agreement required IDA Marketing to provide a capital debenture for the total purchase price of the stock, which was payable in monthly installments with interest at the rate of eight percent per annum. Under the stock purchase agreement, Leach retained a security interest in his stock sold to IDA Marketing for the unpaid balance evidenced by the debenture. The agreement required the stock to be held by an escrow agent. Under the stock purchase agreement, if IDA Marketing defaulted on any installments and the default remained uncured for 90 days after written notice, all unpaid principal and interest was due immediately and Leach's stock would be returned to him. The stock purchase agreement required IDA Marketing to enter into a shareholder control agreement to protect the interests of Leach and other shareholders selling stock to IDA Marketing.

[¶ 4] The shareholder control agreement between IDA Moorhead and IDA Marketing said the corporations had the same board of directors and the same president and chief executive officer. The shareholder control agreement named Kruse as president and chief executive officer of the corporations and said the president and chief executive officer could be terminated for cause as defined by the agreement. Initially, the five person board of directors consisted of two persons selected by James Leach, two persons selected by Kruse, and Val Tareski. Leach served on the board of directors of both corporations at all times relevant to this action. The shareholder control agreement recognized the remaining shares of IDA Marketing were owned by about 73 other shareholders and IDA Marketing was offering to purchase all the other shares under the terms of a Confidential Exchange Offer Memorandum.

[¶ 5] A marketing agreement between IDA Marketing and IDA Moorhead provided that IDA Moorhead would continue manufacturing specialized mobile radio equipment and IDA Marketing would market and sell the equipment. Under the marketing agreement, IDA Marketing's compensation for marketing the equipment included amounts necessary to meet all of IDA Marketing's obligations, including reimbursement of salaries and expenses incurred by IDA Marketing, amounts necessary to purchase the stock of IDA Moorhead under agreements with Leach and other selling shareholders, and amounts necessary to fund other cash needs required by IDA Marketing.

[¶ 6] IDA Marketing and its shareholders, Kruse, Lee, Danuser, and Gruenhagen, executed a September 13, 1994 buy

and sell agreement governing payment to departing shareholders for IDA Marketing stock shares "[u]pon the occurrence of a resignation, termination, death, demotion, and/or disability." The agreement outlined a schedule to determine the valuation and redemption price for a departing shareholder's stock and a payment schedule.

[¶ 7] Kruse served as president and chief executive officer of the corporations from 1994 to 2004, and during his tenure, IDA Marketing's debenture payments to James Leach for his shares of stock in IDA Moorhead were sporadic. In March 2004, Leach served IDA Marketing with a written notice of default for the debenture payments due for the purchase of his stock in IDA Moorhead. After some restructuring and a joint resolution by the corporations' directors, Leach withdrew the notice of default and Danuser became the president and the chief executive officer of the corporations. The shareholder control agreement was also amended to allow IDA Marketing shareholders to transfer their shares without board approval. Danuser eventually became the majority shareholder of IDA Marketing, and after 2004, he loaned $97,000 to IDA Moorhead. Nevertheless, between 2004 and 2010, IDA Marketing's debenture payments to James Leach continued to be sporadic, and during the same time, Danuser received only a few payments on his loans to IDA Moorhead.

[¶ 8] In 2010, James Leach claimed IDA Marketing had defaulted on the required monthly debenture payments to him and requested his full payment for August 2011. Danuser informed Leach the corporations were not financially able to make the full payment. A special meeting for the joint board of directors was scheduled for November 17, 2010, and the directors present at that meeting were Tareski, Gruenhagen, Danuser, James Leach, and James Leach's son, Steve Leach. At the November 17 meeting, the board voted to terminate Danuser's employment as president and chief executive officer of the corporations. James Leach, Steve Leach, Tareski, and Gruenhagen voted for a written corporate resolution stating:

that Reed H. Danuser be immediately terminated from his position as President/CEO [and any other positions of employment] in IDA Marketing ... and IDA of Moorhead ... pursuant to ... the Shareholder Control Agreement dated July 1, 1994, for cause due to Reed H. Danuser having made "improper use of Corporate funds or property", and/or "self dealing detrimental to the Corporation." Reed H. Danuser's termination as an employee/officer with respect to either or both corporations is a result of (a) improper issuance of new shares of stock to himself in IDA Marketing Corporation in violation of ... the Shareholder Control Agreement without the consent of four of the five Directors of the Corporation, and (b) assigning, selling or transferring assets (other than inventory), tangible or intangible, in excess of $25,000 per year in violation of ... the Shareholder Control Agreement without the consent of four of the five Directors of the Corporation.

In addition, Reed H. Danuser has repeatedly caused IDA Marketing Corporation, ... to breach its obligations to James Leach [or his assigns] under (a) the Stock Purchase Agreement dated July 1, 1994, (b) the 8% Capital Debenture dated July 1, 1994, (c) the Security Agreement dated July 1, 1994, and (d) the resulting Escrow Agreement(s) involving James Leach's shares in IDA of Moorhead Corporation, all of which has the effect of adversely impacting the financial position and viability of IDA

Marketing Corporation, a North Dakota corporation.

[¶ 9] According· to Danuser, James Leach controlled and orchestrated his termination as president and chief executive officer of the corporations. James Leach testified, however, he pursued that course of action because:

The meeting I had with [Danuser] prior to that said that there will be nothin' left if I foreclose on that 90–day deal. If I would have foreclosed there I would have gotten nothin'. IDA would have been dead. All employees would have been out of a job, we would have had nothin'. So I had to find something that I could do that would make it legal for— to get rid of [Danuser] that all four directors agreed on.

[¶ 10] After Danuser was terminated at the November 17 board meeting, the directors appointed James Leach president and chief executive officer of the corporations. On November 24, 2010, James Leach and other shareholders selling their stock in IDA Moorhead to IDA Marketing declared the payments for their stock were in default, accelerated the money due on the debenture, and asked the board to waive any right to cure the default and to allow redemption of any stock held as security for the debenture. According to Danuser, the total amount necessary to pay James Leach for the IDA Moorhead stock at that time was $252,576.46. The directors waived further notice of default and allowed James Leach and other shareholders to repossess the IDA Moorhead stock pledged as security for IDA Marketing's debt. The IDA Moorhead stock was later sold to a third party for a total purchase price of $1,180,000.

[¶ 11] Danuser sued IDA Moorhead, IDA Marketing, James Leach, and the three other directors of the corporations, Steve Leach, Gruenhagen, and Tareski, al-leging Danuser was wrongfully terminated without cause in violation of his employment contract and the shareholder control agreement. Danuser alleged that the individual defendants' actions in removing him without cause and freezing him out of corporate governance breached their fiduciary duty to him and that IDA Moorhead and IDA Marketing were liable for loans Danuser had personally made to the corporations. Danuser also alleged a derivative claim on behalf of IDA Marketing to recover damages caused to the corporations.

[¶ 12] The district court granted Danuser partial summary judgment, concluding he had a valid employment contract that authorized termination only for cause and reserving for trial issues about whether he was terminated for cause. The court also decided Danuser was entitled to partial summary judgment against IDA Moorhead in the amount of $97,000 for the principal due on his personal loans to the corporation and reserving for trial issues about the proper credit for interest.

[¶ 13] After a bench trial, the district court decided Danuser was wrongfully terminated without cause. The court also determined James Leach personally breached a fiduciary duty to Danuser but the other individual directors did not breach a fiduciary duty to Danuser, finding James Leach "was certainly in control of the events that lead to Danuser's termination" and "[a]s a result, Danuser was 'frozen out', and any reasonable expectations to continued economic benefits were destroyed." The court said that between 1994 and 2010, James Leach accepted less than full debenture payments for his stock in IDA Moorhead, but in 2010 he demanded full payments, and the court found:

[James] Leach orchestrated the November 17, 2010, board meeting that resulted in Danuser's termination. Other board members were informed only

at the last minute, and played no role in shaping the result other than to vote for it. . . .

It is equally clear from his testimony that Leach chose to oust Danuser in this manner because he was concerned the business would be gutted if he gave the 90 day notice required by the controlling agreements. It is less clear what gave rise to this concern. Whether Danuser could have paid the balance due if given the opportunity will never be known with certainty. However, he was entitled to that opportunity, and had paid dearly for it over the years. According to the records maintained by the corporations' internal bookkeeper, by the time of Danuser's termination Leach had received debenture payments totaling $805,209.02. This was more than the total salary Danuser earned during the corresponding period. Furthermore, [James Leach's wife] was paid an additional $469,774.24 [for her stock].

It was not until November 24, 2010, that written notice of default was provided by any shareholder of IDA Moorhead. A special meeting of the joint board was held on November 29, 2010. Although he was still a board member, Danuser was provided with no notice of this meeting. Before it was over, Leach had convinced the other members to remove Danuser from the board, to replace Danuser with a new board member selected by Leach, to waive further notice of default, and to allow him to immediately reclaim possession of his IDA Moorhead stock—free and clear of any claims. Leach was also named as the new president of the company at a salary of $52,800 per year. Clearly all these events continued to be driven by Leach.

Of course, this was the effective end of IDA Marketing, and all the money remitted by it over the years in the form of debenture payments was forfeited as a result. On November 28, 2010, Leach was authorized by his new board to reissue stock in IDA Moorhead to himself and the other shareholders.

After taking back the business in this manner, Leach proceeded to tidy up loose ends and make it ready for sale. . . .

The business Leach seized was financially solid. The income statements indicated it was generating profits every month, and showed a net profit of $363,298 for the six month period ending January 31, 2011.

In April of 2011, Leach reported to the board the company was in a "strong financial position with $105,000 cash, $582,000 in inventory and $52,000 accounts receivable." Leach recommend that it was an opportune time to sell, and he should be placed in charge of the sale effort. Although Tareski abstained from voting, this motion otherwise passed unanimously.

By this point Leach had already retained a broker to make the sale. It did not take long to find a buyer. . . . The stated purchase price was $1,180,000.

. . . .

In summary, following Kruse's departure, Danuser kept the business going through a combination of hard work, sacrifice and personal commitments. He did so to further his reasonable expectations to continued employment and to ultimate ownership of a controlling interest. When times were tough, Leach agreed to accept the debenture payments the business was able to make. By 2010, for no reasons attributable to Leach, the business had turned around. It was making a good profit and had become marketable. Despite the fact that debenture payments were

increased to the highest level paid since early 2004, Leach suddenly wanted more. Using pretext as an excuse, he took steps designed to freeze out Danuser. Because Danuser was not afforded the 90 day cure period he was entitled to under the terms of the controlling agreements, this was illegal. Furthermore, good faith and fair dealing require that agreements be kept, not circumvented. As a result of his wrongdoing, Leach has received a windfall profit that far exceeds the balance due under the terms of the debenture agreements. The unfair prejudice to Danuser is manifest. He has lost everything, including his job and his ability to share in the proceeds from the sale of the business. All this is completely inconsistent with the "high fiduciary obligations" Leach owed to Danuser "in all mutual dealings." ... In particular, Leach breached his duty "of utmost loyalty and good faith."

[¶ 14] The district court determined the corporations and James Leach were jointly and severally liable to Danuser in the amount of $567,200 for the value of Danuser's lost interest in IDA Marketing and $47,000 for his salary and benefits before IDA Moorhead was sold to the third party. The court also decided IDA Moorhead was liable to Danuser for $130,727.99, which represented the principal plus interest for the loans he personally made to IDA Moorhead.

## II

[¶ 15] James Leach argues the district court erred in finding he breached a fiduciary duty to Danuser. He argues his fiduciary duty as a director extended to the corporations and shareholders collectively and not to an individual shareholder such as Danuser. He claims courts in other jurisdictions apply joint and several liability only in cases where a director is liable for breach of a fiduciary duty to the shareholders collectively and not to individual shareholders. He argues he did not have a contract or special relationship with Danuser which directly imposed a fiduciary duty on him and the court incorrectly assumed he was a co-shareholder with Danuser and erroneously applied fiduciary duties owed to shareholders.

[¶ 16] James Leach was a director in both IDA Moorhead and IDA Marketing and Danuser was a director and an officer in both corporations and was a shareholder in IDA Marketing, a corporation that was formed in an intertwined transaction for IDA Marketing to purchase IDA Moorhead shares owned by James Leach and others. The issues raised in this appeal involve a corporate director's duties and obligations to a shareholder under N.D.C.C. ch. 10–19.1, the North Dakota Business Corporation Act, which "sets out standards of conduct for officers, directors, and those in control of corporations, and provides remedies for violations of those standards. See, e.g., N.D.C.C. §§ 10–19.1–50, 10–19.1–60, 10–19.1–85.1, 10–19.1–115." *Lonesome Dove Petroleum, Inc. v. Nelson,* 2000 ND 104, ¶ 29, 611 N.W.2d 154.

[¶ 17] The interpretation of the statutory provisions in N.D.C.C. ch. 10–19.1 is a question of law, fully reviewable on appeal. *Kortum v. Johnson,* 2008 ND 154, ¶ 14, 755 N.W.2d 432. Words in a statute are given their plain, ordinary, and commonly understood meaning, unless defined by statute or unless a contrary intention plainly appears. N.D.C.C. § 1–02–02. Statutes are construed as a whole and are harmonized to give meaning to related provisions, but special or particular provisions control general provisions. N.D.C.C. § 1–02–07. If the language of a statute is clear and unambiguous, "the letter of it is not to be disregarded under the pretext of

pursuing its spirit." N.D.C.C. § 1–02–05. If the language of a statute is ambiguous, however, a court may resort to extrinsic aids to resolve the ambiguity. N.D.C.C. § 1–02–39.

[¶ 18] In *Kortum*, 2008 ND 154, ¶ 14, 755 N.W.2d 432 (quoting *Lonesome Dove*, 2000 ND 104, ¶ 30, 611 N.W.2d 154), this Court said "Chapter 10–19.1, N.D.C.C., imposes a duty upon officers, directors, and those in control of a corporation to act in good faith, and affords remedies to minority shareholders if those in control act fraudulently, illegally, or in a manner unfairly prejudicial toward any shareholder." *See also Brandt v. Somerville*, 2005 ND 35, ¶ 7, 692 N.W.2d 144; *Fisher v. Fisher*, 1997 ND 176, ¶ 20, 568 N.W.2d 728; *Grinaker v. Grinaker*, 553 N.W.2d 200, 202–03 (N.D.1996); *Fisher v. Fisher*, 546 N.W.2d 354, 358 (N.D.1996); *Schumacher v. Schumacher*, 469 N.W.2d 793, 797 (N.D.1991); *Balvik v. Sylvester*, 411 N.W.2d 383, 385–89 (N.D.1987).

[¶ 19] Subject to limited exceptions not applicable here, the board of directors manage the business and affairs of a corporation. N.D.C.C. § 10–19.1–32. Under N.D.C.C. § 10–19.1–50(1), "[a] director shall discharge the duties of the position of director in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." *See also* N.D.C.C. § 10–19.1–60 (outlining similar standards of care for officers of corporation).

[¶ 20] Section 10–19.1–85.1, N.D.C.C., generally authorizes a court in this state to grant just and reasonable equitable relief in an action by a shareholder if a corporation, an officer, or a director violates N.D.C.C. ch. 10–19.1. Section 10–19.1–86, N.D.C.C., generally authorizes actions by "a shareholder in the right of a domestic or foreign corporation," and N.D.C.C. §§ 10–19.1–87 and 10–19.1–88 grant dissenting shareholders' rights and procedures for asserting their rights, including obtaining fair value for the shareholders' shares in the event of certain corporate actions. Although denominated as a provision for involuntary dissolution of a corporation, N.D.C.C. § 10–19.1–115(1)(b)(3), also specifically and particularly authorizes a shareholder in a closely-held or not publicly-held corporation to obtain other judicial relief and provides:

1. A court may grant any equitable relief it deems just and reasonable in the circumstances or may dissolve a corporation and liquidate its assets and business:

   . . . .

   b. In an action by a shareholder when it is established that:

   . . . .

   (3) The directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders or directors of a corporation that is not a publicly held corporation or as officers or employees of a closely held corporation.

[¶ 21] This Court has recognized that "[a]s a matter of general corporate law, shareholders alleging injury to the corporation must bring an action on behalf of the corporation within the context of a derivative action," but "in a closely held corporation a minority shareholder may bring a direct action, rather than a derivative action, if the shareholder alleges harm . . . distinct from that suffered by other shareholders of the corporation or breach of a special duty owed by the defendant to the shareholder." *Schumacher v. Schumacher*, 469 N.W.2d 793, 798 (N.D.1991). In *Fisher v. Fisher*, 546 N.W.2d 354, 358

(N.D.1996), we upheld a district court's refusal to allow children to intervene as a matter of right in their parents' divorce action in a case in which the children were minority shareholders in their parents' closely-held corporation. We recognized, however, the children were not without remedies, explaining:

> Our Business Corporation Act, chapter 10–19.1, N.D.C.C., however, provides significant protection for minority shareholders in given situations. *See, e.g.,* N.D.C.C. §§ 10–19.1–28 (actions to enjoin ultra vires acts); 10–19.1–86 (actions by shareholders in general); 10–19.1–87 (dissenting shareholders' rights); 10–19.1–88 (asserting dissenters' rights); 10–19.1–115 (involuntary dissolution); 10–19.1–116 (involuntary dissolution procedure). We have recognized that minority shareholders in close corporations have a right to relief when faced with oppressive conduct by the majority. *Balvik v. Sylvester,* 411 N.W.2d 383, 388 (N.D.1987). Depending on the harm suffered, minority shareholders in close corporations may bring derivative or direct actions to obtain relief. *Schumacher v. Schumacher,* 469 N.W.2d 793, 798 (N.D.1991). Under the proper circumstances, [the children] as minority shareholders have many routes to relief under our law: intervention in their parents' divorce is not a necessity.

[¶ 22] Section 10–19.1–01(10), N.D.C.C., defines a "closely held corporation" as "a corporation that does not have more than thirty-five shareholders." In *Kortum,* 2008 ND 154, ¶ 25, 755 N.W.2d 432 (quoting *Balvik v. Sylvester,* 411 N.W.2d at 386), this Court said:

> "The typical attributes of a close corporation are that: (1) the shareholders are few in number, often only two or three; (2) the shareholders usually live in the same geographical area, know each other, and are well acquainted with each other's business skills; (3) all or most of the shareholders are active in the business, usually serving as directors or officers or as key participants in some managerial capacity; and (4) there is no established market for the corporate stock."

In *Kortum,* at ¶ 27, this Court clarified the existence of a fiduciary duty in a closely-held corporation was not conditioned on majority or minority status of shareholders, but whether those in power may improperly work their will on others.

[¶ 23] IDA Marketing had less than thirty-five shareholders and was a closely-held corporation, and IDA Moorhead was not a publicly-held corporation. Danuser was a shareholder of IDA Marketing, which owned stock in IDA Moorhead, and he was a director and president and chief executive officer of both corporations. James Leach was a director of both corporations but was not a shareholder in IDA Marketing and was selling his stock in IDA Moorhead to IDA Marketing. Danuser's action alleged a derivative claim on behalf of IDA Marketing for damages to the corporation and also alleged a claim for wrongful termination as well as an individual shareholder claim by him against the corporations and directors for his damages for freezing him out of the corporations. Danuser's allegations in this case involve more than a derivative claim on behalf of IDA Marketing and a wrongful termination claim on his behalf; he also alleged a claim for his damages for being frozen out of the corporations.

[¶ 24] In *Kortum,* 2008 ND 154, ¶ 2, 755 N.W.2d 432, we considered similar claims in the context of an action by Kortum, a shareholder and at-will employee of a closely-held corporation, against the remaining shareholders for wrongful expulsion from the corporation. A majority of

this Court held that even though Kortum was an at-will employee of the corporation, her termination triggered an inquiry into whether the corporation acted in a manner unfairly prejudicial toward her under N.D.C.C. § 10–19.1–115(1)(b)(3) in her capacity as a shareholder-employee. *Id.* at ¶¶ 21–42.

[¶ 25] Although *Kortum* involved the duties and obligations owed to a shareholder by the other shareholders and this case involves a director's duties and obligations to a shareholder, the plain language of N.D.C.C. § 10–19.1–115(1)(b)(3) authorizes "any equitable relief ... deem[ed] just and reasonable in the circumstances" in an action by a shareholder when it is established that "directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders" in a closely-held corporation. When the particular statutory provisions of N.D.C.C. § 10–19.1–115 are considered together in the context of N.D.C.C. ch. 10–19.1 and Danuser's action against the corporate directors of a closely-held corporation for his individual damages, we conclude James Leach, as a director, had a fiduciary duty not to act in a manner unfairly prejudicial to one or more shareholders in the closely-held corporation under the plain language of N.D.C.C. § 10–19.1–115(1)(b)(3). *See Kortum,* 2008 ND 154, ¶¶ 21–42, 755 N.W.2d 432; *Lonesome Dove,* 2000 ND 104, ¶¶ 29–30, 611 N.W.2d 154.

[¶ 26] Leach's reliance on *Production Credit Ass'n v. Ista,* 451 N.W.2d 118, 121 (N.D.1990), and cases from other jurisdictions for the principle that a director's duties and obligations are to the corporation and shareholders collectively is misplaced. *Ista* involved a loan transaction and claims of a fiduciary relationship by borrowers and shareholders of a lender against the lender, the Production Credit Association; *Ista* did not involve a claimed freeze out of a shareholder in a closely-held corporation, which was found to have been "orchestrated" by a director. *See* 451 N.W.2d at 121. In *Ista,* this Court declined to adopt the borrowers' "novel proposition that PCA, in all of its loan transactions, owes a fiduciary duty to its borrowers arising solely out of their status as stockholders in PCA." *Id.*

[¶ 27] Moreover, cases cited by James Leach for a duty to shareholders collectively did not consider statutory provisions comparable to the particular provisions of N.D.C.C. § 10–19.1–115(1)(b)(3) for closely-held corporations in the context of a freeze out of a shareholder.

[¶ 28] In *McLaughlin v. Schenk,* 2009 UT 64, ¶ 16, 220 P.3d 146, the Utah Supreme Court recognized that directors' duties of good faith, prudent care, and the best interests of the corporation coincide with the common law understanding that officers and directors owe duties to the corporation and shareholders collectively. The court, however, noted the difference between closely-held corporations and publicly-held corporations for purposes of assessing fiduciary duties and recognized the different fiduciary protections afforded to shareholders in closely-held corporations. *Id.* at ¶¶ 20–23. The court said shareholders in closely-held corporations are easily subjected to freeze outs, squeeze outs and other forms of oppression and adopted a broader fiduciary obligation owed to all shareholders in a closely-held corporation. *Id.* at ¶¶ 18, 23.

[¶ 29] In *Redmon v. Griffith,* 202 S.W.3d 225, 233–34 (Tex.App.2006), the Texas Court of Appeals said a corporate officer traditionally owes a fiduciary duty to shareholders collectively in a derivative action, but nevertheless explained that a shareholder may have an individual action for wrongs done individually to the share-

holder regardless of whether the corporation also has a cause of action.

[¶ 30] The plain language of N.D.C.C. ch. 10–19.1 statutorily recognizes the broader fiduciary duties for directors and those in control of closely-held corporations for wrongs directed against individual shareholders and provides for "any equitable relief ... just and reasonable in the circumstances" in an action by "a shareholder" when "directors ... have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders or directors of a corporation that is not a publicly held corporation or as officers or employees of a closely held corporation." N.D.C.C. § 10–19.1–115(1)(b)(3). That plain language authorizes actions by a shareholder against directors when the directors' actions unfairly prejudice "one or more shareholders." James Leach's argument that directors only owe a duty to the corporation and shareholders collectively is contrary to the plain language of N.D.C.C. § 10–19.1–115(1)(b)(3) and would restrict shareholders in closely-held corporations from bringing direct actions for a distinct harm suffered by a single shareholder in cases involving a freeze out of the shareholder. We decline to construe N.D.C.C. ch. 10–19.1 in that manner, and we conclude that as a director James Leach had a fiduciary duty to Danuser to not unfairly prejudice him under the plain language of N.D.C.C. § 10–19.1–115(1)(b)(3). The district court did not err in deciding Leach owed a fiduciary duty to Danuser.

[¶ 31] Whether James Leach breached a fiduciary duty to not unfairly prejudice Danuser is a question of fact. *See Kortum*, 2008 ND 154, ¶ 24, 755 N.W.2d 432; *Brandt*, 2005 ND 35, ¶ 12, 692 N.W.2d 144. A district court's findings of fact are reviewed under the clearly erroneous standard of N.D.R.Civ.P. 52(a).

*Brandt*, at ¶ 12. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all the evidence, we are left with a definite and firm conviction a mistake has been made. *Id.* In a bench trial, the district court determines the credibility of witnesses, and we do not second-guess those credibility determinations. *Id.* Under the clearly erroneous standard of review, we do not reweigh the evidence or reassess the credibility of witnesses, and we will not retry a case or substitute our judgment for a district court's decision merely because we may have reached a different result. *Id.* A choice between two permissible views of the weight of the evidence is not clearly erroneous under that deferential standard of review. *Id.*

[¶ 32] Here, there is evidence from which the district court could conclude James Leach was responsible for freezing out Danuser's interests in the corporations, which, as found by the court, involved more than just the wrongful termination of Danuser's employment. The district court found James Leach breached a fiduciary duty to Danuser and his actions unfairly prejudiced Danuser by freezing him out of the corporations. There is credible evidence in this record to support the court's findings. The court weighed the credibility of the witnesses, and we are not left with a definite and firm conviction the court made a mistake in finding James Leach's actions unfairly prejudiced Danuser. We conclude the court's findings that Leach breached a fiduciary duty to not unfairly prejudice Danuser are not clearly erroneous under N.D.R.Civ.P. 52(a).

III

[¶ 33] James Leach argues the district court abused its discretion in determining the remedy for his conduct. He

argues the court erred in determining Danuser's damages were a share of the proceeds from the subsequent sale of IDA Moorhead to the third party. He claims the buy-sell agreement provides the proper method for valuing shares of the corporations and under that agreement Danuser was only entitled to about $72,000. Danuser responds the court did not err in awarding him a fair value for his shares in IDA Marketing because James Leach is not a party to the buy-sell agreement for IDA Marketing and the agreement is not applicable to the circumstances in this case. Danuser asserts the court had discretion to grant the damages awarded him.

[¶ 34] Chapter 10–19.1, N.D.C.C., grants district court's broad equitable powers to remedy violations of duties by directors. *See* N.D.C.C. §§ 10–19.1–85.1 ("If a ... director ... violates this chapter, a court ... may grant equitable relief it considers just and reasonable in the circumstances.") and 10–19.1–115(1)(b)(3) ("A court may grant any equitable relief it deems just and reasonable."). A court has a wide range of discretion to fashion remedies for a breach of a fiduciary duty, up to and including dissolution of a closely-held corporation, and we review a district court's determination about remedies under the abuse-of-discretion standard. *Brandt*, 2005 ND 35, ¶ 23, 692 N.W.2d 144. "A trial court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, if its decision is not the product of a rational mental process leading to a reasoned determination, or if it misinterprets or misapplies the law." *Id.*

[¶ 35] Leach was not a party to the buy-sell agreement, and although a district court's discretion to fashion appropriate equitable relief for violations of N.D.C.C. ch. 10–19.1 is not unbridled, under the circumstances of this case as found by the district court involving the freeze out of Danuser's interests in the intertwined corporations, we conclude the court's determination of damages was not a misapplication of the law and was not arbitrary, unreasonable, or unconscionable. We therefore conclude the court did not abuse its discretion in its award of damages to Danuser for the breach of the fiduciary duty.

## IV

[¶ 36] IDA Moorhead argues the district court erred in deciding James Leach, IDA Marketing, and IDA Moorhead were jointly and severally liable for Leach's conduct and the court erred in granting Danuser broader relief than he requested at trial. IDA Moorhead claims that based on the defendants' conduct, Danuser's damages were divisible among the defendants and it should not be liable for damages caused by James Leach's conduct.

[¶ 37] Danuser's complaint sought "whatever other relief that is just and equitable," and we conclude the relief granted by the district court was not broader than requested by Danuser in his complaint.

[¶ 38] Corporations are artificial entities that act through their directors, officers and agents. *American Nat'l Fire Ins. Co. v. Hughes*, 2003 ND 43, ¶ 16, 658 N.W.2d 330; *Airvator, Inc. v. Turtle Mountain Mfg. Co.*, 329 N.W.2d 596, 604 (N.D.1983). Under N.D.C.C. ch. 10–19.1, corporations may be liable for the actions of their directors and courts have discretion to grant "any equitable relief it deems just and reasonable in the circumstances" under N.D.C.C. § 10–19.1–115(1)(b)(3). *See Brandt*, 2005 ND 35, ¶ 23, 692 N.W.2d 144. *See also* N.D.C.C. § 10–19.1–85.1 ("a court ... may grant equitable relief it considers just and reasonable in the circumstances"). We re-

view this issue under the abuse-of-discretion standard. *Brandt*, at ¶ 23.

[¶ 39] Here, both James Leach and IDA Moorhead gained from James Leach's actions, which are attributable to the corporation. IDA Marketing, which is now defunct, was closely intertwined with IDA Moorhead and has not contested the court's determination about joint and several liability. The district court decided James Leach had control of the corporations when he breached his fiduciary duties to Danuser. We conclude the district court did not misapply the law in deciding James Leach and the corporations were jointly and severally liable for Danuser's damages and the court's decision was not arbitrary, unreasonable, or unconscionable. We therefore conclude the court did not abuse its discretion in holding James Leach and the corporations jointly and severally liable.

## V

[¶ 40] We affirm the district court judgment.

[¶ 41] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, and ALLAN L. SCHMALENBERGER, S.J., concur.

[¶ 42] The Honorable Allan L. Schmalenberger, S.J., sitting in place of Kapsner, J., disqualified.

CROTHERS, Justice, dissenting.

[¶ 43] The essence of the majority's holding on Leach's liability to a single shareholder states:

"When the particular statutory provisions of N.D.C.C. § 10–19.1–115 are considered together in the context of N.D.C.C. ch. 10–19.1 and Danuser's action against the corporate directors of a closely-held corporation for his individual damages, we conclude James Leach, as a director, had a fiduciary duty not to act in a manner unfairly prejudicial to one or more shareholders in the closely-held corporation under the plain language of N.D.C.C. § 10–19.1–115(1)(b)(3). *See Kortum* [*v. Johnson* ], 2008 ND 154, ¶¶ 21–42, 755 N.W.2d 432; *Lonesome Dove* [*Petroleum, Inc. v. Nelson* ], 2000 ND 104, ¶¶ 29–30, 611 N.W.2d 154."

Majority opinion at ¶ 25.

[¶ 44] In *Kortum v. Johnson*, the defendants did not challenge the application of N.D.C.C. § 10–19.1–115 to a shareholder's individual action against a director. 2008 ND 154, 755 N.W.2d 432. Leach makes that challenge, which leads me to respectfully dissent here for reasons not articulated in *Kortum*. *Id.* (Crothers, J., concurring in part and dissenting in part).

[¶ 45] Section 10–19.1–115, N.D.C.C., is not properly used here to impose liability on Leach in a shareholder action for damages. Section 10–19.1–115 is titled "Involuntary dissolution." Section 115 is not a general provision but is a particular law found in chapter 19.1 in the middle of other provisions specifically related to corporate dissolution. *See* N.D.C.C. §§ 10–19.1–105 (Methods of dissolution), 10–19.1–106 (Voluntary dissolution prior to the issuance of shares), 10–19.1–107 (Voluntary dissolution after the issuance of shares), 10–19.1–108 (Filing notice of intent to dissolve-Effect), 10–19.1–109 (Procedure in dissolution), 10–19.1–110 (Dissolution procedure for corporations that give notice to creditors and claimants), 10–19.1–110.1 (Dissolution procedure for corporations that do not give notice to creditors and claimants), 10–19.1–111 (Claims in dissolution (Repealed)), 10–19.1–112 (Revocation of dissolution proceedings), 10–19.1–113 (Articles of dissolution-Certificate of dissolution-Effect (Repealed)), 10–19.1–113.1

(Filing of articles of dissolution-Effective date of dissolution-Certificate), 10–19.1–114 (Supervised voluntary dissolution), 10–19.1–116 (Procedure in involuntary or supervised voluntary dissolution), 10–19.1–117 (Qualifications of receivers [in dissolution]-Powers), 10–19.1–118 (Action [to dissolve] by attorney general), 10–19.1–119 (Filing claims in proceedings to dissolve), 10–19.1–120 (Discontinuance of dissolution proceedings), and 10–19.1–121 (Decree of dissolution). This statutory organization does not suggest section 10–19.1–115 applies to anything but dissolution, and the majority's expansive reading is unwarranted.

[¶ 46] My reading is supported by history showing section 10–19.1–115 replaced N.D.C.C. § 10–21–16. *See* 10–19.1–115, Derivation (2012). Section 10–21–16, N.D.C.C., was titled "Jurisdiction of court to liquidate assets and business of corporation" and provided a process to dissolve and liquidate the assets by shareholder action when the shareholders or directors were deadlocked, in a creditor's action when the corporation was insolvent, upon the corporation's filing of statement of intent to dissolve or in an action by the attorney general. N.D.C.C. § 10–21–16 (1976). Section 10–19.1–115, N.D.C.C., clearly added remedies upon dissolution to those formerly available in N.D.C.C. § 10–21–16. However, I submit neither section was intended to provide such broad liability on a director to a single shareholder as now is imposed by the majority.

[¶ 47] Under my application of chapter 10–19.1, I would reverse and not reach the damages question. If damages are considered, I question their allocation given the modified comparative fault provisions in N.D.C.C. § 32–03.2–02. This Court has noted, "By enacting N.D.C.C. § 32–03.2–02, the Legislature 'clearly intended to replace joint and several liability with several allocation of damages among those who commit torts in proportion to the fault of those who contributed to an injury.' " *M.M. v. Fargo Public School Dist. No. 1,* 2012 ND 79, ¶ 7, 815 N.W.2d 273 (quotation omitted). Danuser clearly treated the fiduciary duty claim as a tort—he sought punitive damages due to the breach. *See* N.D.C.C. § 32–03.2–11 (exemplary damages only in action "not arising from contract"). However, this issue has not been briefed and the majority does not address it so we must leave its resolution for another day.

[¶ 48] DANIEL J. CROTHERS.